177 P.3d 1139 (2007)
STATE of Washington, Respondent,
v.
Jeffrey Dean SCHALLER, Appellant.
No. 57827-8-I.
Court of Appeals of Washington, Division 1.
December 3, 2007.
Publication Ordered March 3, 2007.
*1141 Todd Maybrown, Maria F. Torres, McNeil Island Correction Ctr., Steilacoom, WA, for Appellant.
Brian M. McDonald, King County Prosecutors Office, Seattle, WA, for Respondent.
GROSSE, J.
¶ 1 Multiple requests to dismiss assigned counsel, without more, does not justify substitution of new counsel. To warrant substitution, good cause such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant must be shown. The decision on whether to substitute counsel is within the discretion of the trial court. Here, the inquiries conducted by the court were sufficiently thorough, and the record does not show that the alleged complete breakdown in communication or conflict between counsel and client affected the quality of representation Jeffrey Schaller received. We affirm.
FACTS
¶ 2 D'Lene Ruth resided with the victim, David Bernfield. In order to earn extra money, Ruth supplied Jeffrey Schaller with cocaine several times a week. Schaller would call Ruth, arrange to pick her up and then drive around to give her money to purchase the drugs. Ruth would then purchase the drugs and deliver them to. Schaller.
¶ 3 On March 5, 2004, Schaller called Ruth asking for drugs. Ruth told Schaller to call back later. Soon thereafter, Schaller arrived at Ruth's door. Ruth saw Schaller holding a gun as he pushed his way into the house. Ruth shouted to Bernfield who was still in bed. Bernfield confronted Schaller and pushed him outside the house. Ruth heard a single gunshot and saw Bernfield stumble back into the house clutching his chest. Ruth saw Schaller drive off in his car. Bernfield later died from his wounds.
¶ 4 A police SWAT team arrested Schaller at his residence and found two knives and a magazine clip for a .380 automatic. After being advised of his Miranda[1] warnings, Schaller stated that "[he] was assaulted, fell down, [and] the gun went off." The gun matching the caliber of the bullet in the victim was recovered from under Schaller's pillow. Schaller was charged with second degree murder. Shortly after his arrest on March 5, 2004, Schaller was assigned attorney Charles DeBruler. DeBruler withdrew on May 3, 2004, and Schaller was then represented by David Hammerstad and Douglas McCrae. By April 2005, Leo Hamaji replaced McCrae as the second attorney on the case. Attorneys Hammerstad and Hamaji represented Schaller throughout the trial.
¶ 5 Schaller's competency was questioned and he was ordered committed for evaluation on May 12, 2004. Dr. Steven Marquez of Western State Hospital found Schaller to be suffering from drug induced delusion, but nonetheless competent to stand trial. A competency hearing before Judge Julie Spector was held on October 21, 2004. During this hearing Schaller testified that there was a covert operation by the police against him. He described seeing a black man dressed in camouflage, hiding in a tree, and hearing sirens signaling the authorities were coming to pick up the man. Schaller's testimony in essence was that the government's conspiracy against him caused him to experience certain symptoms rather than his use of methamphetamine.
¶ 6 While Schaller was testifying regarding the conspiracy, the court interrupted with its own question to determine if Schaller understood why they were in court that day. In response, Schaller testified that he was at this particular hearing to prove that he was able to help his counsel defend him. He described the role of his attorney as someone that gets him the best deal or defends his position. Shaller further contended that he was capable of achieving such a result providing the attorneys explain how they are proceeding. Schaller noted that the prosecutor's job was to see that justice was done. Schaller further characterized the judge's role as that of a referee.
¶ 7 Judge Spector specifically asked whether Schaller had any problems communicating *1142 with his counsel. Schaller responded no and further stated that his counsel had been able to explain what was going on. Questioning from the prosecutor also elicited the fact that he trusted his counsel. Here, Schaller expressed that the shooting was an accident. Schaller finally asserted that he could assist counsel quite well.
¶ 8 On redirect, Schaller admitted that he had some doubts about whether the victim was actually dead because he had seen Bernfield run back into the house. Schaller also asserted that he did not want the jury to know about his conspiracy theory because it sounded ludicrous.
¶ 9 Dr. Marquez recounted Schaller's delusion of believing there was a governmental conspiracy against him to prevent him from spreading the truth about methamphetamine and its abilities to provide telekinetic and clairvoyant abilities to the user. Dr. Michael Dixon, a private clinical psychologist, testified that Schaller's delusions might cross over into his perception of the reality of his current legal situation. Dr. Dixon testified that Schaller believed the seriousness of the charges against him to be between 8 or 9 on a scale of 1 to 10. Dr. Dixon further testified that Schaller conceptually recognized what he was charged with and what the potential sentencing range was.
¶ 10 After Schaller was determined to be competent, the parties discussed a continuance that would result in an extension of Schaller's right to a speedy trial. Judge Spector directly questioned Schaller about his understanding of the fact that he was found competent and asked if he was in agreement with the continuance. Schaller responded, "I'd rather not, but yes I defer to my attorney."
¶ 11 Five months later, on March 4, 2005, Schaller moved to fire his attorneys. McCrae was being reassigned and Hammerstad was on vacation so neither defense attorney was present at this hearing. Schaller was represented by' Judy Baskin. Schaller expressed his concerns to Judge Ronald Kessler regarding his lack of access to discovery and the failure of his attorneys to subpoena a recorded conversation. Schaller accused his attorneys of lying about obtaining the discovery documents and then failing to do so. The judge found no evidence that Schaller's attorneys had lied to him and further that Schaller was not entitled to the documents on the basis of the court rule then in effect.[2]
¶ 12 On March 21, 2005, defense counsel requested a continuance from Judge Kessler so that an expert witness would have time to conduct an examination which would support Schaller's defense of accidental shooting. At that time Hammerstad informed the court that Schaller objected to the continuance and further that Schaller still wished to fire his attorneys. Schaller addressed the court directly again complaining that he had not received the discovery material he wanted, in particular a police recorded conversation. Hammerstad interjected that there was nothing in discovery which indicated that the conversation Schaller referred to had been recorded. Because Schaller was having difficulty framing his issues and Hammerstad had another trial, the court granted the originally requested continuance while at the same time allowing Schaller to raise the issue at a later time if he still needed to do so. Although couched in different terms, this request was similar to the complaint Schaller raised previously.
¶ 13 On May 12, 2005, Hammerstad requested a competency hearing because defense counsel felt Schaller was no longer able to mentally compartmentalize his thoughts between his delusions and the case at hand. Schaller was vehemently contending that the person he was accused of killing was not dead. Schaller argued that he had already been found competent and he wanted to address his concerns and his grievances against his counsel. The trial court required Schaller to undergo another psychiatric evaluation; but ruled that Schaller's motion to dismiss his attorneys would be addressed if he were deemed competent.
*1143 ¶ 14 A competency hearing was held on August 23, 2005, and the court found Schaller competent. Schaller again moved to fire his attorneys. This time the root of his motion was because Schaller had told. Hammerstad not to tell his ex-wife anything about the criminal case and that Hammerstad had violated the law by informing her of the fact that he was at Western State Hospital. In fact, Schaller's ex-wife had been contacted and interviewed by Dr. Martinez in the first psychiatric evaluation of Schaller.
COURT: It's in the record, sir.
MR. SCHALLER: That is a violation of the RCW
COURT: It's a public document.
MR. SCHALLER: No, sir, it is not. Don't lie to me.
COURT: You want to fire me too?
MR. SCHALLER: I've already filed charges against you, sir. RCW 70.02.090 is confidentiality of medical records. And this is attorney-client privilege as well.
COURT: No, sir. You're wrong,
MR. SCHALLER: Medical records. You cannot tell anyone outside this court or, that hospital that I am being sent to Western State.
COURT: You're wrong.
MR. SCHALLER: That's a violation of RCW.
COURT: All right. You're entitled to that opinion, sir. But on that basis, I'm denying the motion.
MR. SCHALLER: Oh, you're denying the motion. Well, you've already violated my rights to due process for about seven months now.
¶ 15 On September 16, 2006, at an omnibus hearing before Judge Kessler, the court gave Schaller another opportunity to address his representation. At this time Schaller contended that his attorneys had requested him to perjure himself.
MR. HAMMERSTAD: I don't know any way I could address it without addressingnumber one, addressing confidential communications between myself and my client and discussing matters. For what it's worth, the fact that I have initiated a motion to get off this case now seems to be a source of concern for Mr. Schaller. .
COURT: Well, I understand that point. I mean, I understand it. It doesn't mean that you need to do it, but. The thing is, you'd be in the same exact position whether he initiates it or you initiate it. It doesn't change how I deal with it, but I can understand how he feels that way.
MR. SCHALLER: If you'll notice, I attempted to work with my attorneys for quite a while. And in fact, when I first contacted the Office of Public Defense, I told Carole Finzer I would rather solve the issues than fire my attorneys at that time. It was after they had lied to her that I decided to fire 
COURT: Even ifnow I'm not making any kind of a finding for this offense, but even if Mr. Hammerstad had done what you claimed he did in terms of your testimony, you're in control of it. I'm going to deny the motion.
MR. SCHALLER: So you condone perjury? Is that correct? Is that what you're saying?
COURT: The matter will go to trial. Thank you.
¶ 16 The case was sent out for trial on September 26, 2005. Hammerstad and Hamaji represented. Schaller throughout the trial. In pretrial motions, Schaller again requested removal of his attorneys. Judge Sharon Armstrong informed Schaller that she was aware of the motions that had previously been made and denied by Judge Kessler and would not hear the same motion. Schaller stated it was something else. The court directed Schaller to outline a summary of his concerns. Schaller then set forth his need for a recorded conversation he had with the police which would show his lack of intent to cause the victim's death. Schaller claimed there was lost or missing evidence. The court inquired of the prosecutor whether the State had any response to this. The prosecutor responded that to his knowledge there was no lost or missing evidence. The trial judge remarked that it was too bad that Schaller did not get along with his counsel because they had done an incredibly good job *1144 in both their trial brief and motions in limine.[3]
¶ 17 On the morning of September 26, 2005, Hammerstad asked for an ex parte sealed hearing and the judge excused the prosecutor. Hammerstad again raised the issue of competency because Schaller did not believe the victim to be David Bernfield. Because of this belief,[4] Hammerstad asserted that Schaller was not competent"able to assist counsel." The court noted that this was the same basis upon which the court had sent Schaller for a second competency evaluation. The court refused to further address competency.
¶ 18 The State rested its case on October 3, 2005. Defense counsel again raised the issue of competency and requested an ex parte hearing. Hamaji stated that Schaller did not want to speak with them and further that he was going to testify. On the way to court, Schaller told his attorneys that he believed that they were working in cahoots with the prosecution. Schaller also believed the jurors were all bought and paid for. Claiming that this is a conspiracy-Schaller asked to speak to the judge. Hamaji asked whether Schaller would like to do that outside the attorneys' presence and Schaller responded, "It doesn't matter."
¶ 19 Judge Armstrong heard directly from Schaller. Schaller again raised his issues with missing evidence that would show he was innocent and with the renumbering of certain evidentiary exhibits. When the court inquired what Schaller was seeking, Schaller responded that he wanted not only a mistrial, but also that the matter be investigated. Schaller claimed that the man who attacked him was not the man in the photographs. Judge Armstrong found Schaller to be competent and "while he doesn't like his attorneys apparently, he has an ability to communicate with them."
¶ 20 Schaller then further stated that his attorneys requested that he perjure himself. The court pointed out that he was in control of his own testimony and the trial proceeded. Defense put on several witnesses concluding with Schaller's own testimony. The defense was more than adequate in putting forth Schaller's theory that the shooting was an accident.
¶ 21 When the jury returned the verdict, Schaller physically attacked his attorney Hammerstad. Hammerstad's motion to withdraw at that time was granted. Schaller was represented by another attorney for the sentencing phase. Schaller appeals his conviction.

ANALYSIS
¶ 22 Schaller asserts the judges abused their discretion in denying his various motions to dismiss his attorneys because they failed to fully balance the issues against his Sixth. Amendment right to conflict-free representation. But a defendant does not have an absolute right under the Sixth Amendment to his choice of a particular advocates[5] Whether a defendant's dissatisfaction or personal embarrassment surrounding his interactions with his counsel is meritorious or justifies the appointment of new counsel is a matter within the discretion of the trial court.[6]
¶ 23 Schaller must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant.[7] Counsel and defendant must be at such odds as to prevent presentation of an adequate *1145 defense.[8] The defendant may not rely on a general loss of confidence or trust alone to justify appointment of a substitute new counsel.[9] Here, Schaller claims irreconcilable conflict and/or complete breakdown in communication with counsel. An irreconcilable conflict occurs when the breakdown of the relationship results in the complete denial of counsel.[10]
¶ 24 The Washington Supreme Court in Stenson II[11] held that a significant dispute over trial strategy coupled with a strained relationship between the defendant and his counsel did not warrant substitution of counsel. Stenson wanted his attorneys to blame another suspect while his attorneys had concluded that the guilt phase could hot be won and did not want to take any action which might alienate the jury at the, penalty phase.[12] Like Schaller, Stenson complained that his attorneys would not investigate matters that he thought were important and that they did not keep him sufficiently informed.[13] Matters became so heated that defense counsel requested to be removed from the case and acknowledged that Yie could not stand the sight of Stenson.[14] In rejecting Stenson's claim of irreconcilable conflict, the court noted that the effects of the breakdown appeared negligible and that there was no evidence that the representation was inadequate.[15]
¶ 25 Schaller relies on Ninth Circuit Court cases in which the court found irreconcilable conflict.[16] In particular, he relies upon United States v. Nguyen for the proposition that a trial court should question the attorney or defendant "`privately and in depth'" and examine available witnesses in order to make a sufficient inquiry into a criminal defendant's request for substitution of appointed counsel.[17] The facts of Nguyen, however, are significantly different than those here. In Nguyen, a non-English speaking defendant repeatedly asked to substitute privately retained counsel for his public defender with whom he ceased communicating. Nguyen offered witnesses to support his claim about his public defender's conduct but the court did not pursue any of the allegations. Rather, the court decided the matter at a pretrial meeting for which the defendant was neither present nor aware of and then refused to give Nguyen a full hearing on the issue.[18] On appeal, the Ninth Circuit Court of Appeals found the trial court's decision was based more on keeping its schedule than on any inquiry into Nguyen's contentions.[19]
¶ 26 The trial court in the present case, unlike Nguyen, explored the issues with Schaller. Contrary to Schaller's assertions, he has not shown a complete breakdown in communication or other irreconcilable conflict. In further contrast with Nguyen, Schaller did not offer any witnesses to support his claims. Here, the record is replete with examples of fully effective and appropriate representation upon the part of Schaller's counsel. Schaller felt free to discuss the issues in front of his attorneys, and they were well aware of the strategy that Schaller wished to employ. A change in counsel would not have brought about any different result. Schaller was a difficult client and his psychiatric evaluations recognized that although competent he would be difficult for any attorney to work with. In fact, defense counsel recognized that a substitution of counsel would not cure the problem.
¶ 27 As enumerated in Stenson II, the factors a trial court utilizes to determine whether to grant a motion to substitute counsel *1146 are "(1) the reasons given for the dissatisfaction, (2) the court's own evaluation of counsel, and (3) the effect of any substitution upon the scheduled proceedings."[20]
¶ 28 In examining the extent of the conflict, this court considers the extent and nature of the breakdown in the relationship and its effect on the representation actually presented.[21] If the representation is inadequate, prejudice is presumed. If the representation is adequate, prejudice must be shown.[22] Because the purpose of providing assistance of counsel is to ensure that defendants receive a fair trial, the appropriate inquiry necessarily must focus on the adversarial process, not only on the defendant's relationship with his lawyer as such. "[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."[23] Here, the record does not establish anything approaching inadequate representation nor does it show that Schaller's right to effective assistance of counsel was jeopardized by his continued representation with his attorneys.
¶ 29 Schaller's refusal to meet with his attorneys after the State rested is insufficient in and of itself to constitute an irreconcilable conflict. It is well settled that a defendant is not entitled to demand a reassignment of counsel on the basis of a breakdown in communications where he simply refuses to cooperate with his attorneys.[24]
¶ 30 Schaller also claims that the inquiries conducted by the various judges Were inadequate. But a trial court conducts adequate inquiry by allowing the defendant and counsel to express their concerns fully.[25] Here, the various judges permitted Schaller to address his concerns. He was questioned by those judges and queried about whether his conflicts really affected his case. Formal inquiry is not always essential where the defendant otherwise states his reasons for dissatisfaction on the record.[26]
¶ 31 Schaller's motions were heard by each of the judges before whom Schaller voiced his concerns. Schaller was afforded an opportunity to enumerate those concerns. Those concerns, which were primarily evidentiary, failed to persuade the trial court that denial of his request for new counsel would substantially impair his Sixth Amendment right to counsel.
¶ 32 Schaller has failed to demonstrate that there was a complete breakdown of communication due to any irreconcilable conflict. Schaller's counsel performed professionally and acted vigorously in his defense. Defense counsel raised a number of legal and evidentiary motions both pretrial and on Schaller's behalf during the trial. The record demonstrates that Schaller received highly competent and qualified representation.
¶ 33 Here, the various judges allowed Schaller to file a number of motions and make arguments explaining himself to the court. Formal inquiry is not always essential where the defendant otherwise states his reasons for dissatisfaction on the record.[27] The trial court did not abuse its discretion in denying Schaller substitution of counsel.
¶ 34 The trial court i§ affirmed.
WE CONCUR: BECKER and AGM, JJ.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Former CrR.4.7(h)(3)(2005) provided that discovery was to "remain in the exclusive custody of the attorney."
[3] Defense counsel Hammerstad and Hamaji submitted extensive pretrial motions in limine regarding testimony. The court granted several of defense counsel's motions in limine excluding testimony on a number of issues.
[4] The root of Schaller's belief that the victim was alive was the coroner's report which named "Xavier Doe" rather than "David Bernfield" in the first paragraph of its description.
[5] State v. DeWeese, 117 Wash.2d 369, 375-76, 816 P.2d 1 (1991) (citing Wheat v. United States, 486 U.S. 153, 159 n. 3, 108 S.Ct. 1692, 100 L.Ed,2d 140 (1988)).
[6] State v. Cross, 156 Wash.2d 580, 132 P.3d 80 (2006) (citing State v. Stenson, 132 Wash.2d 668, 733, 940 P.2d 1239 (1997) (Stenson I )).
[7] Stenson I, 132 Wash.2d at 734, 940 P.2d 1239 (citing Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir.1991)).
[8] State v. Lopez, 79 Wash.App. 755, 766-67, 904 P.2d 1179 (1995) (citing United States v. Morrison, 946 F.2d 484, 498 (7th Cir.1991)).
[9] Stenson I, 132 Wash.2d at 734, 940 P.2d 1239.
[10] In re Pers. Restraint of Stenson, 142 Wash.2d 710, 722, 16 P.3d 1 (2001) (Stenson II).
[11] Stenson II, 142 Wash.2d 710, 16 P.3d 1.
[12] Stenson II, 142 Wash.2d at 726-27, 16 P.3d 1.
[13] Stenson II, 142 Wash.2d at 727, 16 P.3d 1.
[14] Stenson 142 Wash.2d at 729, 16 P.3d 1.
[15] Stenson II, 142 Wash.2d at 729-30, 16 P.3d 1.
[16] United States v. Adelzo-Gonzalez, 268 F.3d 772 (9th Cir.2001); United States v. Nguyen, 262 F.3d 998 (9th Cir.2001); United States v. Moore, 159 F.3d 1154 (9th Cir.1998).
[17] Nguyen, 262 F.3d at 1004 (quoting Moore, 159 F.3d at 1160).
[18] Nguyen, 262 F.3d at 1003.
[19] Nguyen, 262 F.3d at 1005.
[20] Stenson II, 142 Wash.2d at 723, 16 P.3d 1.
[21] Stenson H, 142 Wash.2d at 724, 16 P.3d 1.
[22] Cross, 156 Wash.2d 580, 132 P.3d 80 (absent actual ineffective assistance of counsel, trial strategy is left to the attorney and client to work out).
[23] Wheat, 486 U.S. at 159, 108 S.Ct. 1692.
[24] Harding v. Davis, 878 F.2d 1341, 1344 n. 2 (11th Cir.1989) ("[A]n accused cannot force the appointment of new counsel by simply refusing to cooperate with his attorney, notwithstanding the attorney's competence and willingness to assist.").
[25] State v. Varga, 151 Wash.2d 179, 200-01, 86 P.3d 139 (2004); Stenson 142 Wash.2d at 731, 16 P.3d 1.
[26] United States v. Willie, 941 F.2d 1384, 1391 (10th Cir.1991); United States v. Padilla, 819 F.2d 952, 956 n. 1 (10th Cir.1987).
[27] Willie, 941 F.2d at 1391; Padilla, 819 F.2d at 956 n. 1.