# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 68534-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| CURTIS JOHN WALKER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 31, 2014 |

LAU, J. — Curtis Walker appeals his convictions for the premeditated murder of 12-year-old Alajawan Brown and for first degree unlawful possession of a firearm. He contends that the trial court erred by (1) admitting evidence of his Bloods street gang affiliation; (2) denying his requests for substitution of appointed counsel; (3) commenting on a fact dispute regarding the operability of a firearm; and (4) instructing the jury that if it found all elements of the charged crimes proved beyond a reasonable doubt, it had a "duty" to convict. He also raises two issues regarding premeditation in his pro se statement of additional grounds. Finding no errors, we affirm the convictions.

## FACTS

Late in the afternoon on April 29, 2010, Alajawan Brown was shot and killed in a 7-Eleven parking lot after a bus ride to the Skyway area of King County. The State

charged Curtis Walker with first degree murder and first degree unlawful possession of a firearm.

According to trial testimony, on the day of the shooting, Jonathan Jackson called his friend Walker. Jackson said he was in front of Walker's apartment, that he was going to knock somebody out, and that he needed a ride to the fight. Walker's wife, Shaleese Walker, tried to talk Walker out of leaving.[1] Walker picked Jackson up in a black Cadillac, and Walker's neighbor, Rodriquez Rabun, got in the back seat. Shaleese followed them in a burgundy Cadillac.[2] They drove to the Cedar Village Apartments in Skyway.

Shaleese thought a gang dispute might happen there.

Q. Now, when Curtis [Walker] left for Cedar Village, you knew things were going to be pretty bad?
A. Actually, I didn't. I got a phone call that said he is going to get your husband into something. I didn't expect anything like this.
Q. It looked to you like it was going to involve Crips and Bloods?
A. When we got there, yes.
Q. Right?
A. Ah um.

RP (Jan. 26, 2012) at 1183. A friend told her the Cedar Village Apartments is "Crips territory," and Crips and Bloods don't get along. Report of Proceedings (RP) (Jan. 26, 2012) at 1183. Shaleese later told police officers that the fight involved Crips and Bloods.

---

[1] Trial testimony shows Jonathan Jackson used the moniker "P" or "PC," Rodriquez Rabun used the moniker "D-Ro," and Curtis Walker used the moniker "C-Dub." We refer to Shaleese Walker by her first name to avoid confusion. The name of the witness referred to below as "BK" is Earl Barrington.

[2] Testimony at trial also described the Cadillac as red.

About 25 to 30 people, all wearing "blackish blue," gathered outside the Cedar Village complex.[3] RP (Jan. 12, 2012) at 456. Rabun, Jackson, and Walker wore red hats.[4] According to Rabun, the people outside the complex wore "blackish blue." RP (Jan. 12, 2012) at 456. He testified that blue signifies Crips, red signifies Bloods, and talk about Crips and Bloods means, "[i]t's gang related." RP (Jan. 12, 2012) at 456. Walker referred to himself as "OG," a term that means "somebody who has been in a gang for a while."[5] RP (Jan. 24, 2012) at 868. An OG is "sort of a counselor or a teacher to the younger kids that are coming up." RP (Jan. 30, 2012) at 1401.

Outside the Cedar Village complex, Jackson argued with a man known to trial witnesses as BK. Someone mentioned that Jackson and BK were "cousins." RP (Jan. 12, 2012) at 443. BK, who wore blue, had his gun out. Jackson carried a .22 caliber chrome handgun that belonged to Walker.[6] Rabun carried a 9 mm black semiautomatic, a handgun legally registered to him.

The conflict escalated quickly. Several people in the crowd fired their guns. BK shot Jackson multiple times. Thinking he had been shot, Rabun returned the gunfire. When Walker saw Jackson lying on the ground, he jumped into the back seat of the burgundy Cadillac driven by Shaleese. Shaleese quickly drove away while Rabun

---

[3] Rabun estimated "40 or 50 people standing outside." RP (Jan. 12, 2012) at 442-43.

[4] Walker told detectives he wore red "head-to-toe" the evening of the shooting. RP (Jan. 30, 2012) at 1396.

[5] "OG" means "old gangster."

[6] At that time, Walker kept the gun in the console of his black Cadillac.

followed, driving the black Cadillac. The first 911 call about the Cedar Village shooting came in at 5:57 pm.

About 200 yards from the apartments is the 7-Eleven store where Brown was killed. It sits at the intersection of Martin Luther King Jr. Way (MLK) and South 129th Street. This area is in Crips territory. Shaleese stopped at the intersection. Rabun stopped behind her. He watched as Walker stood outside the burgundy Cadillac, pointed his outstretched arm, and fired a "chrome revolver" three times in Brown's direction. RP (Jan. 12, 2012) at 460. He said Walker was "[a]iming at the young man." RP (Jan. 12, 2012) at 460. Brown turned and ran toward the 7-Eleven when he saw Walker aiming the gun at him.

Brown wore "[j]eans, tennis shoes, a raggedy blue T-shirt, and a blue and black North Face jacket." RP (Jan. 12, 2012) at 541.

Brown died from a single gunshot wound. The medical examiner determined that the bullet entered Brown's "left mid back." RP (Jan. 25, 2012) at 1091. The police recovered a second bullet from a sign post on South 129th Street, near the 7-Eleven. Analysis of this bullet's trajectory established that the shooter fired in the general direction of the 7-Eleven store.

Skyway resident Stacy Sparks stopped in the left turn lane at the corner of MLK and South 129th Street. She saw two cars behind her, "a maroon-ish car and a black car." RP (Jan. 17, 2012) at 565. She said the weather was sunny and her windows were down. She noticed a young man (Brown) with a blue coat and a white bag "casually walking down the sidewalk." RP (Jan. 17, 2012) at 568. She heard Shaleese talking loudly on her phone, say, "There he goes, there he goes." RP (Jan. 17, 2012) at

570. Sparks saw the maroon and black cars stop in the center lane, between her car and the 7-Eleven.

Sparks heard a "pow, pow, pow" sound as Brown was shot. RP (Jan. 17, 2012) at 569. She saw Brown drop his bag. She then saw a man, carrying a silver revolver and wearing a hat, a blue shirt, and a black leather jacket, walk against the flow of traffic and get into the black car.[7] Walker wore a black leather jacket on the day of the murder. Approximately four minutes after the Cedar Village shooting, Sparks called 911 at 6:01 PM. At trial, she positively identified Walker as the shooter.

Austin Cassell was at the 7-Eleven when he saw Brown carrying a bag. He also saw a burgundy car and a black car stop at the nearby intersection. He heard gunshots and saw Brown turn from the cars and yell, "Help me. Help me." RP (Jan. 17, 2012) at 597. He thought the shooter fired from inside the burgundy car. He described the shooter's gun as "a chrome gun, silver" but "not a revolver." RP (Jan. 17, 2012) at 599. He described the shooter as "heavier set." RP (Jan. 17, 2012) at 598.

Cassell's stepbrother, Ryan Harper, saw the shooting from the front passenger seat of Harper's car. At trial, he identified Walker as the shooter. He saw Walker exit the "backside passenger door" of a burgundy or maroon Cadillac and, within seconds, shoot Brown twice with a "chrome" gun. RP (Jan. 17, 2012) at 616, 618. He saw Walker get into the black Cadillac and both cars speed away.

---

[7] Security video from the Cedar Village Apartments showed Walker wearing a black or dark jacket, black or dark pants, and a red hat. Walker is five feet six inches tall and weighs 255 pounds. Rabun is six feet two inches tall and weighs 190 pounds. None of the 7-Eleven witnesses described the shooter as matching Rabun's description.

Taylor Cassell and his friend Paul Dekker were sitting in the back seat of Austin Cassell's car. Both heard gunfire. Dekker saw a black male place an object into his belt and climb into the passenger side of a black car. He saw the red car in front and the black car both drive away fast. He heard the gunshots and told police officers he was 95 percent certain that the shooter was standing outside in front of one of the two cars.

Rabun said, "We [Jackson and Walker] always wore red. . . . [b]ecause I guess the environment I was in. We had on red." RP (Jan. 12, 2012) at 455-56. He testified that after he pulled up behind Shaleese and Walker at the 7-Eleven stoplight, Walker got out of the car and fired several shots at Brown with a chrome colored revolver. Shaleese immediately gunned it, leaving Walker behind. Walker ran back and jumped into the car with Rabun. He told Rabun to "mash it." RP (Jan. 12, 2012) at 463. A few blocks away, Rabun collided violently with a car and continued to flee.

Rabun met up with Shaleese at an empty parking lot. Shaleese angrily asked Walker, "Why did you kill that little boy?" RP (Jan. 12, 2012) at 469. Rabun said, "She was freaking out, and she was crying and everything." RP (Jan. 12, 2012) at 469. Walker answered, "'Because he killed my homeboy.'"[8] RP (Jan. 12, 2012) at 470. Shaleese immediately drove away and hysterically called a friend to say Walker had done something crazy. Rabun drove Walker to a remote cul-de-sac in Renton. Walker handed Rabun two chrome guns and told him to "take the guns out there." RP (Jan. 12, 2012) at 474. Rabun took the guns, including his own, and dumped them in a wooded area. Surveillance video showed a man leaving a black car, pausing momentarily in an

---

[8] Rabun clarified, "[Walker] said the N word." RP (Jan. 12, 2012) at 470.

empty field, and returning to the car. One of the guns was the chrome revolver Walker held when he jumped into the black Cadillac outside the 7-Eleven.

The police recovered three loaded guns from the field near the cul-de-sac. One of the guns, a chrome-colored .38 caliber Smith & Wesson revolver, had two empty shell casings and two live rounds in the wheel. Ballistics testing established that the bullets recovered from Brown's body and the sign post near the 7-Eleven parking lot had been fired from the .38 revolver.

Forensic scientist Tara Roy testified that she obtained a DNA (deoxyribonucleic acid) sample from the grip and the trigger of the .38 revolver. She found no match as to the DNA profile obtained from the grip. But the DNA profile obtained from the trigger closely matched Walker's reference profile. She explained:

> The DNA profile that I obtained from the trigger of the revolver was a mixture as well, consistent with at least two individuals, the major component of a male individual and matches the reference profile of Curtis Walker.
> The estimated probability of selecting at random from the U.S. population with a matching profile is one in 2.7 quadrillion. It is inconclusive whether Shaleese Walker is included or excluded as a possible contributor. Rodriguez [sic] Rabun is excluded as a possible contributor.

RP (Jan. 25, 2012) at 1063. The DNA obtained from the .38 ammunition was consistent with a single male—Walker. The estimated probability of selecting at random from the United States population with a matching profile was one in 120 million. Shaleese and Rabun were included as possible contributors to this profile.

After dumping the guns, Rabun drove Walker to a house owned by Walker's "homeboy," Speedy. RP (Jan. 12, 2012) at 476. Shaleese drove to the house and removed her belongings from the black Cadillac. Walker told Speedy to "strip" the car. RP (Jan. 30, 2012) at 1373. The black Cadillac was stripped and cleaned of prints and

-7-

identifying information. A King County sheriff's deputy later found the abandoned car in Renton.

The State extensively cross-examined Shaleese and Walker, revealing numerous inconsistencies between statements they made to detectives and their trial testimony. They both testified that Rabun shot Brown.

In closing, the State argued that Jackson and Walker viewed the Cedar Village fight as a "chance to show red," and that Jackson and Walker were surprised when they found themselves "outnumbered in terms of people in blue and black, and in terms of guns." RP (Feb. 1, 2012) at 1588. It argued that Walker shot Brown outside the 7-Eleven because he mistook Brown, who was dressed in blue, for Jackson's shooter. It argued that Walker wanted revenge for the earlier shooting:

> And within four minutes, enough time for BK to get to the 7-11, and Alajawan Brown made the fatal misfortune of stepping off that bus at the wrong time. Dressed just like a Crips, blue and black, in jeans, like BK, being in the wrong place, in the defendant's site [sic], the wrong time when the defendant's frustration and anger, and desire for revenge, was at its peak, and had escalated because of what he had just seen, and he levelled on a 12 year old boy.

RP (Feb. 1, 2012) at 1590-91.

The State also argued that Walker shot Brown because Brown resembled a member of the Crips:

> [Brown] was wearing blue, he was wearing jeans. He was right where the Crips could have run from Cedar Village in the amount of time it took to get down there to the 7-11. Someone, that the defendant thought was his homie, someone the defendant thought had killed his homie. And who knows that if he thought it was the actual shooter, or if it was one of the Crips, one of many men of the Crips who was firing that day and shooting indiscriminately all over.

RP (Feb. 1, 2012) at 1598. It argued in summary that Walker "decided that [Brown] was the person who shot [Jackson] or he was a Crips." RP (Feb. 1, 2012) at 1624.

-8-

The jury found Walker guilty of first degree murder and first degree unlawful possession of a firearm. By special verdict, it also found that Walker murdered Brown while armed with a firearm. The trial court imposed a standard range sentence with a firearm enhancement. Walker appeals his convictions.

## ANALYSIS

### Gang Affiliation Evidence

Walker contends the trial court abused its discretion by allowing evidence of his membership in the Bloods street gang.[9] The State responds the evidence supports its theory that Walker, an admitted Blood street gang member, shot and killed an innocent bystander, Alajawan Brown, because he thought Brown was a Crips street gang member who had been involved just moments before in a shootout with him and other Bloods street gang members. The State argues the trial court properly admitted the gang affiliation evidence as res gestae evidence and to establish motive,[10] intent, and premeditation under ER 404(b).[11]

---

[9] No transcript of the trial court's final 404(b) ruling appears in our record. And Walker cites to none. He specifically alleges admission of gang affiliation evidence violated federal and state due process rights to a fair trial, lacked relevance, created undue prejudice, infringed on his First Amendment right to freedom of association, and lacked a nexus between the crime and the gang evidence.

[10] "[M]otive goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act." State v. Powell, 126 Wn.2d 244, 259, 893 P.2d 615 (1995). The Powell court defined motive as, "'Cause or reason that moves the will . . . An inducement, or that which leads or tempts the mind to indulge a criminal act. . . . the moving power which impels to action for a definite result . . . that which incites or stimulates a person to do an act.'" Powell, 126 Wn.2d at 259 (quoting State v. Tharp, 96 Wn.2d 591, 597, 637 P.2d 961 (1981)).

[11] The trial court gave the jury the following cautionary instructions. The first instruction stated, "Certain evidence has been admitted in this case for only a limited

The State's trial brief offer of proof as to the gang affiliation evidence stated:

> The defendant is affiliated with the Bloods gang. He is now known as an "OG," or "old gangster," not actively out committing crimes but still carrying the affiliation, wearing pieces of red clothing, and socializing with members of the gang. The defendant was wearing a red hat on the day of the shooting. The Bloods are enemies of the Crips, who wear blue. The Cedar Village apartment complex is considered to be the territory of the Crips.
>
> Jonathan Jackson, the victim in the Cedar Village Apartments shooting, was a friend of the defendant and affiliated with the Bloods. The person who shot him was wearing blue, as if a Crip. Alajawan Brown, who was not a member of any gang, also happened to be wearing blue when he was shot. The State's theory is that the defendant shot Brown in part because he was wearing blue, mistaking him for the Crip who had shot the defendant's Blood friend. A gang detective would testify to the significance of gang relationships, colors, and language.

Evidence Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Under this rule, evidence of other misconduct is not admissible to show that a defendant is a criminal type. State v. Lough, 125 Wn.2d 847, 853, 889 P.2d 487 (1995). However, crimes or misconduct other than the acts for which a defendant is charged may be admitted for other reasons. Lough, 125 Wn.2d at 853. Courts may admit gang affiliation evidence to establish the motive for the crime. State v. Yarbrough, 151 Wn. App. 66, 210 P.3d 1029 (2009). Evidence of gang affiliation is considered prejudicial. State v. Asaeli, 150 Wn. App. 543, 579, 208 P.3d 1136 (2009). Therefore, a nexus

---

purpose. This evidence consists of testimony regarding gangs and may be considered by you only for the purpose of motive, premeditation, intent, and lack of accident. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation." The second instruction stated, "Gang membership in and of itself does not constitute a crime."

between the crime and gang affiliation must be established before the court may find the evidence relevant. State v. Scott, 151 Wn. App. 520, 526, 213 P.3d 71 (2009).

Another allowable purpose for admitting evidence of other misconduct is to complete the story of the crime on trial by proving its immediate context. State v. Lane, 125 Wn.2d 825, 831, 889 P.2d 929 (1995). The rationale for res gestae or "same transaction" evidence is to ensure that the jury knows "the whole story":

> A defendant cannot insulate himself by committing a string of connected offenses and then argue that the evidence of the other uncharged crimes is inadmissible because it shows the defendant's bad character, thus forcing the State to present a fragmented version of the events. Under the res gestae or "same transaction" exception to ER 404(b), evidence of other crimes or bad acts is admissible to complete the story of a crime or to provide the immediate context for events close in both time and place to the charged crime.

State v. Lillard, 122 Wn. App. 422, 431-32, 93 P.3d 969 (2004) (footnote omitted). Once the trial court finds "same transaction" evidence relevant for a nonpropensity purpose and not unduly prejudicial, ER 404(b) does not exclude it so long as the State proves the acts actually occurred by a preponderance of the evidence. Lane, 125 Wn.2d at 834. Evidence is relevant if it makes the existence of a consequential fact more or less probative. State v. Saltarelli, 98 Wn.2d 358, 361-62, 655 P.2d 697 (1982).

"Where another offense constitutes a 'link in the chain' of an unbroken sequence of events surrounding the charged offense, evidence of that offense is admissible 'in order that a complete picture be depicted for the jury.'" State v. Hughes, 118 Wn. App. 713, 725, 77 P.3d 681 (2003) (quoting State v. Brown, 132 Wn.2d 529, 571, 940 P.2d 546 (1997)).

In State v. Campbell, 78 Wn. App. 813, 901 P.2d 1050 (1995), Division Three of this court affirmed a trial court ruling permitting evidence of the defendant's gang

affiliation and drug dealing under ER 404(b) in a prosecution for two counts of murder. The victims were members of the same gang as the defendant, the Crips, although they did not belong to the same subset. The State theorized that Campbell and two other gang members killed the victims in a dispute over drug sales territory. The court held that the evidence "clearly was highly probative of the State's theory—that Campbell was a gang member who responded with violence to challenges to his status and to invasions of his drug sales territory." Campbell, 78 Wn. App. at 822.

Similarly, the evidence here was relevant to the State's theory of why Walker, without provocation, would murder Brown, an innocent bystander. Walker believed, mistakenly, that Brown was a rival Crips gang member who had been involved just minutes before in a shootout with him and other Bloods street gang members. The record summarized above amply supports this theory and establishes the necessary nexus between Brown's murder and gang membership.

The gang affiliation evidence is also admissible as res gestae or "same transaction" evidence, discussed above. As summarized above, the record shows the Cedar Village shootout happened within minutes of and 200 yards from the 7-Eleven where Brown was shot. The Cedar Village shootout involving rival gang members[12] set the stage for Walker to shoot Brown. The gang affiliation evidence "explained parts of the whole story which otherwise would have remained unexplained." State v. Mutchler, 53 Wn. App. 898, 902, 771 P.2d 1168 (1989). That evidence also completed the story and provided essential context for events close in both time and place to Brown's

_____

[12] There is ample evidence from which the jury could reasonably infer the Cedar Village shootout involved rival gang members—the Bloods and the Crips—instead of a family dispute between "cousins."

-12-

murder. In sum, the State connected Walker's gang affiliation with his motive for shooting Brown.

Absent an abuse of discretion, we decline to disturb the trial court's ER 404(b) ruling. The court abuses its discretion if a ruling is manifestly unreasonable or based on untenable grounds or reasons. We conclude the trial court properly admitted the gang affiliation evidence to show motive and as res gestae evidence.

Substitution of Counsel

Walker next assigns error to the trial court's denial of his motions to substitute appointed counsel. He contends that he and his attorney suffered a complete breakdown in communication. He also argues that the court failed to inquire meaningfully into the nature of the conflict. The State contends that the court properly exercised its discretion in denying Walker's motions.

"[A] defendant does not have an absolute right under the Sixth Amendment to his choice of a particular advocate." State v. Schaller, 143 Wn. App. 258, 267, 177 P.3d 1139 (2007). "To justify appointment of new counsel, a defendant 'must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant.'" State v. Varga, 151 Wn.2d 179, 200, 86 P.3d 139 (2004) (quoting State v. Stenson, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997) (Stenson I)); see also State v. Cross, 156 Wn.2d 580, 608, 132 P.3d 80 (2006) (reviewing court asks whether the defendant's "representation has been irrevocably poisoned").

"Whether an indigent defendant's dissatisfaction with his court-appointed counsel is meritorious and justifies the appointment of new counsel is a matter within the discretion of the trial court." Stenson I, 132 Wn.2d at 733.

> Under an abuse of discretion standard, the reviewing court will find error only when the trial court's decision (1) adopts a view that no reasonable person would take and is thus "manifestly unreasonable," (2) rests on facts unsupported in the record and is thus based on "untenable grounds," or (3) was reached by applying the wrong legal standard and is thus made "for untenable reasons."

State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012) (quoting State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

"When reviewing a trial court's refusal to appoint new counsel, we consider '(1) the extent of the conflict, (2) the adequacy of the [trial court's] inquiry, and (3) the timeliness of the motion.'" Cross, 156 Wn.2d at 607 (alteration in original) (quoting In re Pers. Restraint of Stenson, 142 Wn.2d 710, 724, 16 P.3d 1 (2001) (Stenson II)).

We consider the extent of the conflict by examining "the extent and nature of the breakdown in communication between attorney and client and the breakdown's effect on the representation the client actually receives."[13] Stenson II, 142 Wn.2d at 724. Walker twice moved for appointment of substitute counsel.

### Initial Motion to Substitute Counsel

At the June 30, 2011 hearing on Walker's initial motion, attorney Jerry Stimmel stated that Walker had "lost confidence" in his representation. RP (June 30, 2011) at 19. He explained that Walker's disenchantment stemmed from two issues. First, he

---

[13] Walker contends that "consideration of whether counsel did a 'good job' for Walker is irrelevant to the question of whether substitution was proper." Br. of Appellant at 44. He overstates the rule. Settled law holds that we may consider "the effect of the conflict on the representation actually provided." State v. Thompson, 169 Wn. App. 436, 458, 290 P.3d 996 (2012); see also Stenson II, 142 Wn.2d at 724.

acknowledged that he was "behind in our discovery in this case." RP (June 30, 2011) at 20. He additionally speculated that Walker perceived him "as being too cozy with the prosecutor." RP (June 30, 2011) at 21. Second, he acknowledged that Walker had "a legitimate concern" regarding lack of telephone communication. RP (June 30, 2011) at 21. He explained that problems with the jail telephone system made communication difficult. He claimed the telephone system did not allow inmates to leave voice messages. The trial court offered to "bring the [telephone system] vendor in if that's necessary to address that question." RP (June 30, 2012) at 30. It concluded, "I think there are ways of working around that in terms of the communication between you." RP (June 30, 2012) at 31.

The court heard from Walker. Walker said, "I believe that Mr. Stimmel has addressed this issue pretty forward." RP (June 30, 2011) at 22. He also complained about the defense investigator's lack of preparation. Finally, he stated, "I feel that I should have been able to contact and communicate with my lawyer whenever I needed to . . . ." RP (June 30, 2011) at 23. He asked the court to appoint an attorney his wife consulted. The attorney was not present at the hearing.

The State told the court that Stimmel worked "diligently" on the case. The prosecutor acknowledged that "part of the discovery problems are those of the State's." RP (June 30, 2011) at 24. She asserted that Stimmel was "rapidly moving exactly as fast as he should be, given what our trial date is." RP (June 30, 2011) at 25. The court concluded that both sides appeared to be "fully informed." RP (June 30, 2011) at 31. It noted that Walker provided no evidence "that inadequate instructions have been given to any investigators to work on this case." RP (June 30, 2011) at 31. The court

-15-

attributed Walker's concerns to generalized anxiety about the proceedings and a nonspecific lack of "comfort" with Stimmel. RP (June 30, 2011) at 33.

"Generally, a defendant's loss of confidence or trust in his counsel is not sufficient reason to appoint new counsel." Varga, 151 Wn.2d at 200; see also Cross, 156 Wn.2d at 606 ("[T]here is a difference between a complete collapse and mere lack of accord."); State v. Sinclair, 46 Wn. App. 433, 436, 730 P.2d 742 (1986) (defendant's "general discomfort" with counsel's representation did not constitute a "valid reason to replace appointed counsel"). Walker fails to explain how issues regarding telephone communication and the pace of discovery amounted to a complete breakdown in communication. We properly entrust decisions regarding trial strategy to counsel. State v. Thompson, 169 Wn. App. 436, 459, 290 P.3d 996 (2012); see also Cross, 156 Wn.2d at 608 (conflict over strategy not equivalent to a conflict of interest).

We next consider the adequacy of the trial court's inquiry. The court "must conduct 'such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and concern.'" United States v. Adelzo-Gonzalez, 268 F.3d 772, 777 (9th Cir. 2001) (quoting United States v. Garcia, 924 F.2d 925, 926 (9th Cir. 1991)). The trial court "'has an obligation to inquire thoroughly into the factual basis of the defendant's dissatisfaction.'" Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir. 1991) (quoting United States v. Hart, 557 F.2d 162, 163 (8th Cir. 1977)). We noted, "[A] trial court conducts adequate inquiry by allowing the defendant and counsel to express their concerns fully." Schaller, 143 Wn. App. at 271; see also Cross, 156 Wn.2d at 610 (adequate inquiry requires "a full airing of the concerns"). Walker does not challenge the adequacy of the

trial court's inquiry at the June 30, 2011 hearing. Stimmel addressed the court at length, and Walker largely agreed with Stimmel's statements.

Finally, we consider the timeliness of Walker's motion. Walker first moved for substitution of counsel approximately 10 weeks before the original trial date. When asked about the effect of a continuance on third parties, the State indicated that the victim's family was "in agony, wanting it to be done." RP (June 30, 2011) at 25. Stimmel told the court he was on the "brink" in terms of his readiness for trial. RP (June 30, 2011) at 26. The court concluded, "The effect of new counsel coming in at this time would inevitably lead to a very substantial delay in a trial of this case . . . ." RP (June 30, 2011) at 32-33. The court properly denied Walker's first substitution motion.

### Renewed Motion to Substitute Counsel

The court continued the trial date to January 2012. On October 14, 2011, Walker renewed his motion to substitute counsel by letter. He noted his ongoing inability to contact Stimmel by phone. He said, "I have to use a third party to contact him by phone or email." He added, "When I try contacting him by phone, he never answers. When I contact him by email sometimes he doesn't respond." He acknowledged that Stimmel visited him twice, but complained that the meetings lasted for "no more than 15 min." He wrote, "I feel [Stimmel] is keeping me in the dark. . . . I do not feel he has my best interest." He also wrote, "I have filed a grievance with the Washington State Bar

Association on this matter." Our record contains no evidence that Walker filed a grievance.[14]

At a later hearing, Stimmel expressed concern over Walker's alleged bar grievance. He stated, "I just don't feel that I can prepare adequately while looking over my shoulder about the Bar grievance." RP (Oct. 17, 2011) at 76-77. He also addressed Walker's concern regarding lack of communication. He said, "[Walker] believes he is being kept in the dark and if he thinks that my representations to the contrary are useless." RP (Oct. 17, 2011) at 77. He said a face-to-face meeting at the jail fell through when jail officers failed to bring Walker to the meeting room.

The prosecutor argued against substitution, stating, "I don't think Mr. Walker understands all the work that Mr. Stimmel has done on this case, and I can personally attest to it because I've sat through all the defense interviews that he's done with my witnesses." RP (Oct. 17, 2011) at 80. The State argued that Walker demonstrated no irreconcilable conflict.

Stimmel responded, "Well, with regard to irreconcilable communication difficulties, there are some dynamics within the defense that I cannot disclose publicly." RP (Oct. 17, 2011) at 81. He noted, however, that "Walker himself has been extremely amiable, cooperative and honest with me." RP (Oct. 17, 2011) at 81. The court stated, "I can understand his being uneasy as the trial approaches that has so much significance to him . . . ." RP (Oct. 17, 2011) at 81. The State observed that Walker lacked a "full understanding of what's involved." RP (Oct. 17, 2011) at 80. The court

---

[14] Walker writes in his appellate brief, "After Walker's first motion was denied, conditions deteriorated to the point that Walker filed a bar complaint against Stimmel." Br. of Appellant at 42. Contrary to RAP 10.3(a)(6), he provides no citation to the record.

declined to appoint substitute counsel, concluding that Walker appeared "to be predominately concerned with the system we have rather than Mr. Stimmel as his lawyer." RP (Oct. 17, 2011) at 81.

As noted above, a defendant's loss of confidence or trust in his attorney generally provides an insufficient basis for substitution of counsel. Varga, 151 Wn.2d at 200. Further, the filing of a bar grievance does not necessitate the appointment of substitute counsel. In Sinclair, the defendant argued that his formal complaint against appointed counsel created a conflict of interest. Sinclair, 46 Wn. App. at 437. We rejected the argument, reasoning that a defendant should not be permitted to "force the appointment of a new attorney simply by filing such a complaint, regardless of its merit." Sinclair, 46 Wn. App. at 437. Here, Stimmel claimed he could not focus on the case while responding to a bar grievance. He acknowledged, however, that he lacked official notice of the alleged grievance and did not know its substance. He later described Walker as "amiable, cooperative and honest." RP (Oct. 17, 2011) at 81. The record demonstrates no irreconcilable conflict or communications breakdown.

According to Walker, the court should have questioned Stimmel regarding his statement that an irreconcilable conflict had arisen from "dynamics within the defense" that he could not "disclose publicly." RP (Oct. 17, 2011) at 81. He believes the court had an "affirmative duty" to discover the root of the undisclosed conflict. Br. of Appellant at 41. We have held, however, that "a trial court conducts adequate inquiry by allowing the defendant and counsel to express their concerns fully." Schaller, 143 Wn. App. at 271. Walker submitted a letter in which he described his concerns. The court asked Walker no questions but heard extensive testimony from Stimmel. Neither Walker nor

Stimmel asked for an in camera hearing to discuss the "dynamics within the defense" that Stimmel claimed he could not "disclose publicly."[15] RP (Oct. 17, 2011) at 81. On appeal, Walker identifies no material fact "that would have been elicited had the court inquired further." Sinclair, 46 Wn. App. at 436.

Walker argues that "although the trial was pending, the date was not so imminent that it could not have been continued." Br. of Appellant at 41. The record indicates otherwise. The State observed, "The family of this victim has been waiting a year." RP (Oct. 17. 2011) at 80. The court concluded that another delay would be "unacceptable," particularly given "the needs of our system to be able to resolve it based upon the freshest testimony reasonably available to us." RP (Oct. 17, 2011) at 81-82.

Walker also claims that "Stimmel had identified counsel who would be willing to substitute for him." Br. of Appellant at 41. Stimmel advised the trial court that he located a potential replacement attorney. But he acknowledged this attorney was not available for immediate substitution. He said, "She can't substitute today because she needs to talk to Mr. Walker, and even if she could substitute today, I'm quite certain that neither she nor any other lawyer that [the Office of Public Defense] could appoint would be available to handle a trial this close to the trial date." RP (Oct. 17, 2011) at 79.

"[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v.

---

[15] The trial court may hold an in camera hearing to satisfy its duty of adequate inquiry. Cross, 156 Wn.2d at 610.

-20-

United States, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988). We noted that "the purpose of providing assistance of counsel is to ensure that defendants receive a fair trial." Schaller, 143 Wn. App. at 270. In denying Walker's renewed motion, the court encouraged the appointment of co-counsel to assist Stimmel. Walker raised no further issue regarding the adequacy of his representation after co-counsel was appointed.

The trial court properly denied Walker's renewed substitution motion.

Comment on the Evidence

Walker next contends that the trial court improperly commented on the evidence premised on jury instruction 19, which defined "firearm" for purposes of first degree unlawful possession of a firearm.[16] The instruction stated:

> A "firearm" is a weapon from which a projectile may be fired by an explosive such as gunpowder. A temporarily inoperable firearm that can be rendered operational with reasonable effort and within a reasonable time period is a "firearm." A disassembled firearm that can be rendered operational with reasonable effort and within a reasonable time is a "firearm."

Walker claims this instruction "resolved the disputed question of operability" of the .22 caliber handgun he admittedly possessed.[17] He argues the instruction was an improper judicial comment under Washington State Constitution, article IV, section 16.[18]

---

[16] Walker does not challenge the sufficiency of the evidence supporting his firearm possession conviction.

[17] At trial, Walker stipulated that his criminal history included a "serious offense" for purposes of the unlawful possession of a firearm statute, RCW 9.41.040. He also admitted that he possessed the .22 caliber handgun abandoned by Rabun near the remote cul-de-sac in Renton. He claimed, however, that the gun was inoperable. He explained, "If the bullet is in the clip, that bullet will come back out and bend." RP (Jan. 30, 2012) at 1412. The State's ballistics examiner testified that the gun could fire a

Walker acknowledges that he took no exception to instruction 19 below. "An objection to a jury instruction cannot be raised for the first time on appeal unless the instructional error is of constitutional magnitude." State v. Dent, 123 Wn.2d 467, 478, 869 P.2d 392 (1994). We may review Walker's challenge under RAP 2.5(a)(3).[19] See State v. Becker, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997) ("'Since a comment on the evidence violates a constitutional prohibition, [a] failure to object or move for a mistrial does not foreclose [him or] her from raising this issue on appeal.") (alterations in original) (quoting State v. Lampshire, 74 Wn.2d 888, 893, 447 P.2d 727 (1968)); see also State v. Jackman, 156 Wn.2d 736, 743, 132 P.3d 136 (2006) (claim that a jury instruction contains a judicial comment may be raised for the first time on appeal).

The record, however, demonstrates no trial court error. "We review jury instructions de novo, within the context of the jury instructions as a whole." State v. Levy, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). Instruction 19 defined "firearm" as "a weapon from which a projectile may be fired by an explosive such as gunpowder." Under RCW 9.41.010(7), "'Firearm' means a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." Thus, the instruction closely tracked applicable statutory language.

---

bullet. He explained, "It would fire, but extracting and ejecting [the casing], it seemed to have a little bit of a problem with that." RP (Jan. 24, 2012) at 1004.

[18] Under article IV, section 16, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."

[19] RAP 2.5(a) provides: "The appellate court may refuse to review any claim of error which was not raised in the trial court. However, a party may raise the following claimed errors for the first time in the appellate court: . . . (3) manifest error affecting a constitutional right."

The instruction also stated that a "temporarily inoperable" or "disassembled" firearm is still a firearm, provided it "can be rendered operational with reasonable effort and within a reasonable time . . . ." This expanded definition finds support in our case law. Interpreting former RCW 9.41.010(1), which is identical to current RCW 9.41.010(7), we have concluded that "a disassembled firearm that can be rendered operational with reasonable effort and within a reasonable time period is a firearm within the meaning of RCW 9.41.010(1)." State v. Padilla, 95 Wn. App. 531, 535, 978 P.2d 1113 (1999). We distinguished guns that have been "rendered permanently inoperable," concluding that such devices were not firearms. Padilla, 95 Wn. App. at 535 (emphasis in original). Division Two of this court later relied on Padilla for the proposition that "[a] firearm that can be rendered operational with reasonable effort and within a reasonable time period is a firearm within the meaning of former RCW 9.41.010(1)." State v. Raleigh, 157 Wn. App. 728, 736, 238 P.3d 1211 (2010). We have explained that "an unloaded gun is still a 'firearm' because it can be rendered operational merely by inserting ammunition." State v. Releford, 148 Wn. App. 478, 491, 200 P.3d 729 (2009). Walker cites no contrary authority.

"An instruction which does no more than accurately state the law pertaining to an issue in the case does not constitute an impermissible comment on the evidence by a trial judge under article 4, section 16." Tincani v. Inland Empire Zoological Soc'y, 66 Wn. App. 852, 861, 837 P.2d 640 (1992), affirmed in part, reversed in part on other grounds, 124 Wn.2d 121 (1994). Here, instruction 19 is a correct statement of the law defining "firearm." Instruction 19 resolved no disputed fact issue and directed no verdict on a charged crime. The jury was free to determine, based on the evidence at trial, that

-23-

Walker's .22 caliber handgun was permanently inoperable—or that, for whatever reason, it could not be rendered operational with reasonable effort and within a reasonable time. The court properly instructed the jury.

### "To-Convict" Instructions

Walker argues that the trial court erred in instructing the jury that it had a "duty to return a verdict of guilty" if it found all the elements of the offense beyond a reasonable doubt. This argument is controlled by our decision in State v. Ryan P. Moore, No. 69766-8 (Wash. Feb. 18, 2014) and the cases cited therein.

### STATEMENT OF ADDITIONAL GROUNDS (SAG)

Walker raises two issues in his pro se SAG. First, he argues, without citation to authority, that the reference to "premeditated intent" in the first degree murder statute is unconstitutionally vague.[20] RCW 9A.32.030(1)(a). "When a challenged statute does not involve First Amendment rights, the statute is not properly evaluated for facial vagueness, but must be evaluated in light of the particular facts of each case." State v. Halstien, 122 Wn.2d 109, 117, 857 P.2d 270 (1993). "Accordingly, the ordinance is tested for unconstitutional vagueness by inspecting the actual conduct of the party who challenges the ordinance and not by examining hypothetical situations at the periphery of the ordinance's scope." City of Spokane v. Douglass, 115 Wn.2d 171, 182-83, 795 P.2d 693 (1990). "A statute is vague if either it fails to define the offense with sufficient precision that a person of ordinary intelligence can understand it, or if it does not provide standards sufficiently specific to prevent arbitrary enforcement." State v.

---

[20] RCW 9A.32.030(1) provides in part: "A person is guilty of murder in the first degree when: (a) With a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person . . . ."

-24-

Eckblad, 152 Wn.2d 515, 518, 98 P.3d 1184 (2004). "The party challenging a statute carries the burden of proving its unconstitutionality." Halstien, 122 Wn.2d at 118. Walker does not explain why the first degree murder statute's "premeditated intent" language was unconstitutionally vague as applied to his conduct. Given the evidence at trial, we conclude that the language is not unconstitutionally vague as applied.

Walker next argues that the court erred when it denied his motion to dismiss the murder charge. He brought the motion at the close of the State's evidence, arguing as a factual matter that the State failed to establish premeditation. "A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from it." State v. O'Neal, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). Evidence is sufficient if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (emphasis omitted) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). We draw all reasonable inferences from the evidence in favor of the State and interpret them "most strongly against the defendant." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

"[P]remeditation is 'the deliberate formation of and reflection upon the intent to take a human life' and involves 'the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.'" State v. Pirtle, 127 Wn.2d 628, 644, 904 P.2d 245 (1995) (quoting State v. Gentry, 125 Wn.2d 570, 597-98, 888 P.2d 1105 (1995)). "Premeditation must involve more than a moment in point of time." State v. Ollens, 107 Wn.2d 848, 850, 733 P.2d 984 (1987).

Shortly before the 7-Eleven shooting, Shaleese said, "There he goes, there he goes." RP (Jan. 17, 2012) at 570. Walker exited the burgundy Cadillac, pointed his outstretched arm at Brown, and fired with a .38 caliber revolver. Brown turned and ran when he saw Walker aiming at him. The bullet hit Brown in his back. Viewing these facts in the State's favor, a rational jury could easily find that Walker engaged in "the mental process of thinking beforehand" before shooting Brown. Gentry, 125 Wn.2d at 597-98. We conclude that Walker's SAG lacks merit.

CONCLUSION

For the reasons discussed above, we affirm Walker's convictions.

WE CONCUR: