FILED
COURT OF APPEALS
DIVISION II

2015 JUL 28 AM 8: 27

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Welfare of<br><br>BD,<br><br><br>A Minor Child. | No. 46504-3-II<br><br><br><br>UNPUBLISHED OPINION |

WORSWICK, P.J. — DD is the father of BD, a boy born in 2011. DD moved to modify a commissioner's ruling affirming the juvenile court's order terminating his parental rights as to BD. Specifically, DD sought to modify the commissioner's rulings that (1) he was not denied the right to counsel while unrepresented during a two week period prior to the termination trial, (2) his right to effective assistance of counsel was not violated by the juvenile court's denial of his motion for substitute counsel, and (3) his due process rights were not violated by the guardian ad litem's (GAL) conduct. On April 22, 2015, we granted DD's motion to modify to the extent necessary to refer the matter to a panel for a decision on the motion. After reviewing the motion and hearing arguments from the parties, we deny DD's motion to modify with respect to the commissioner's ruling on the GAL's conduct in this case. We grant in part DD's motion to modify with respect to the remaining two issues, which issues we address in this opinion, but we nonetheless affirm the juvenile court's order terminating DD's parental rights as to BD.

FACTS

I. DEPENDENCY PROCEEDINGS

On August 16, 2011, the Department of Social and Health Services filed a dependency petition as to BD, alleging BD was abused or neglected and had no parent, guardian, or custodian capable of adequately caring for him, such that he was in circumstances which constituted a danger of substantial damage to his psychological or physical development. The juvenile court entered an agreed order of dependency as to BD on December 14, 2011, which order required DD to participate in a domestic violence assessment and a psychological evaluation with a parenting component.[1] At the time, the juvenile court allowed DD to have one supervised visit per week with BD.

During the dependency action, the Department offered DD domestic violence assessments, domestic violence treatment, a psychological evaluation, hands-on parenting training, and counseling. The Department also offered DD parent-child visits with BD, although the juvenile court restricted visitation at various times throughout the dependency. Between August 2011 and April 2012, visitation was offered twice per week. DD missed 22 of the 50 scheduled visits and was late to several of the visits he attended. In March 2012, DD quit attending visits altogether, claiming that the linoleum floors and one-way mirrors at the Department's visitation site caused him anxiety. Although the Department offered DD a room without mirrors, he still refused to attend.

---

[1] Almost a year later, on December 11, 2012, DD filed a motion to vacate the agreed dependency order on the basis that he was under emotional distress at the time he agreed to the order. The juvenile court denied DD's motion to vacate the dependency order, which order a commissioner of this court later affirmed.

Between May and August 2012, the parent-child visits occurred in the community, with supervision provided through a private agency. The private supervising agency eventually refused to supervise any more visits, however, because DD was secretly audio-recording one of its employees. In addition, BD's mother e-mailed the Department in August 2012, accusing DD of making threats to "go on a murder spree if things did not go his way." Clerk's Papers (CP) at 194. Thereafter, the juvenile court ordered the visits to return to either the Department or the Department of Youth for Christ. DD refused to attend visits at either location.

In late October 2012, the Department supervised visits at a public library. A private agency took over the supervision of the visits until November 2012, when DD reported he could no longer attend visits because of a shoulder injury. Parent-child visits resumed at the library again in February 2013, but were returned to the Department's office the following month based on a comment DD had made to the visitation supervisor regarding his friend, Josh Powell, who had murdered his children.[2] DD again refused to attend visits at the Department.

In October 2013, DD agreed to attend visits at the Department's Tumwater office. Visitation with BD occurred there until late November 2013, when the Department received an e-mail from DD's psychologist that he had concerns for BD if visits continued with DD. On December 12, 2013, the juvenile court suspended parent-child visits between DD and BD, finding that BD was at risk based on the psychologist's e-mail. The juvenile court's order stated, "This shall be revisited upon further information from the father's Greater Lakes Mental Health counselor that the father is making progress and not a risk to his son." Ex. 39 at 2.

---

[2] According to the supervisor, DD said that "he hoped that if his rights were terminated with [BD] that he did not do a Josh Powell." 2 Report or Proceedings at 182.

The Department social worker, Naz Qureshi, thereafter contacted DD's counselor, who reported that DD had not been in counseling since December 19, 2013. At the next dependency review hearing on January 23, 2014, the juvenile court found that DD was not in compliance with its court order and was not making progress on correcting his parenting deficiencies. It ordered for visits to remain suspended. As of the termination fact finding hearing in June 2014, visitation had not resumed.

## II. CLAY'S REPRESENTATION

On June 24, 2013, the Department of Assigned Counsel (DAC) filed a notice with the juvenile court that Christopher Clay was being substituted as court appointed counsel for DD in the dependency and termination proceedings. Clay was DD's fifth attorney representing him in this matter. Over nine months later, on March 28, 2014, the Department filed a motion for an order releasing DD's drug/alcohol, medical, and mental health treatment records from various providers.[3]

At the April 17 hearing to address the Department's records release motion, Clay informed the juvenile court commissioner that DD was filing a bar complaint against him. Clay requested a continuance of the records release hearing to allow him time to file a formal motion to withdraw as counsel. Clay stated:

> I talked to Ms. Calhoun [the assistant attorney general] about this. She would [like] to go forward. I think, on the records motion. But uh, I think everything, if we continue any of it, it all has to be continued for [DD]. I was validly served. I mean

---

[3] These providers included Greater Lakes Mental Health, Social Treatment Opportunity Program, Mark Whitehall, Ph.D., Loren W. McCollom, Ph.D., and Foster Care Resource Network.

that motion is timely for today. But uh, I can't honestly represent him in any legal capacity in today's hearing because of what I've been told this morning.

Suppl. Report of Proceedings (RP) (April 17, 2014) at 4.

The juvenile court commissioner then heard from DD, who stated that he had received ineffective representation by Clay. The juvenile court commissioner asked DD why he thought Clay was ineffective, to which DD responded that Clay had a conflict of interest because he (1) had not advocated for visitation or a process to get visitation resumed after the last hearing, (2) failed to object to evidence presented at the hearing, and (3) was inadequately prepared for certain motions. The juvenile court commissioner then stated that he was going to release Clay from representation, not because DD had established a conflict of interest, but because DD had lost confidence in Clay. The juvenile court commissioner ordered the DAC to appoint new counsel for DD and ruled that the termination trial set for May 21, 2014 would proceed as scheduled.

Immediately after removing Clay as counsel and without appointing new counsel, the juvenile court commissioner addressed the Department's records motion, asking if DD wished to be heard on the motion. DD stated that he did not know if he was prepared to represent himself in the matter. Without responding to DD's comment, the juvenile court commissioner stated, "I'm going to order that the records motion be granted. It may be subject to be revisited by another attorney at a later point in time, as the matter comes on for trial." Suppl. RP (April 17, 2014) at 8. In its written ruling, the juvenile court commissioner ordered that any copies of records the Department received would be provided to DD's new attorney. In addition, the juvenile court commissioner ordered that the confidentiality privilege was waived and the

5

drug/alcohol, medical, and mental health treatment personnel would be allowed to testify at the termination trial.

On April 22, 2014, the DAC filed a motion to revise the juvenile court commissioner's ruling, arguing that the reasons given by DD at the April 17 hearing were insufficient for appointment of a new attorney. Following a hearing before the juvenile court on the motion the following day, the juvenile court concluded that the DAC had standing for purposes of its motion to revise, and it ordered the DAC to appoint counsel for DD "only as it relates to the motion to revise." CP at 99.

On April 24, 2014, the DAC appointed Andrew Makar as DD's counsel for the motion to revise the juvenile court commissioner's ruling. On May 1, 2014, the parties appeared before the juvenile court to address the DAC's motion to revise. Following argument,[4] the juvenile court revised the commissioner's ruling and reinstated Clay as DD's attorney. It also denied DD's motion to stay the termination trial set for May 21, 2014. DD thereafter filed a motion for discretionary review with this court, which motion we denied.

The termination proceedings went forward on May 21 with Clay as counsel for DD. DD did not appear in court on May 21. On that date, Clay informed the juvenile court that DD wished to have a new attorney appointed. The juvenile court declined to hear the request because DD was not present. DD appeared the following day for a dependency review hearing, at which time DD again moved for substitute counsel, alleging a complete breakdown in communication with Clay. The juvenile court commissioner declined to hear the motion, stating

---

[4] The record from that proceeding is not before us.

that the termination trial was scheduled to be heard by a trial judge who should rule on DD's motion for substitute counsel.

Following the May 22 hearing, the Department filed a memorandum regarding the status of DD's counsel. The Department argued that DD had forfeited his right to an attorney through extremely dilatory conduct. The Department asserted that DD had caused delay in the proceedings by filing multiple appeals with this Court, one of which resulted in a stay of the termination trial, and by threatening bar complaints against Clay and making other complaints against his former attorneys.

On June 4, 2014, the parties appeared before the juvenile court and addressed the Department's memorandum regarding the status of DD's counsel. The juvenile court stated that it thought the issue of DD's representation had been put to rest by the previous order reinstating Clay. But Clay stated that the juvenile court should readdress the issue, as a number of things had happened since the order was entered. Clay stated that, although he had promised the juvenile court at the May 1 hearing, at which he was reappointed as counsel for DD, that he would be prepared to proceed with the scheduled termination trial, there were issues that had arisen since the May 1 hearing that caused him difficulty in preparing for trial. Clay stated there had been a change in his relationship with DD since he was reappointed, resulting in DD's filing of the bar complaint, as well as a complete communication breakdown. Clay also stated that the juvenile court should hear from DD regarding his other complaints.

The juvenile court then heard from DD, who stated Clay had not argued previous issues to his liking or in a timely fashion, such as the motion to vacate the agreed dependency order. The juvenile court then stated:

Okay. Your disagreement with a lawyer about whether a motion is appropriate or not isn't a basis for a new attorney. He's the one practicing law. He's the one who's making appropriate decisions about how your case ought to proceed. You may disagree with your lawyer, and that's fine, but ultimately, your lawyer has an ethical obligation to present motions that he thinks are taken in good faith, argue them in a way that are argued in good faith, and represent you in the best way he can. That's his job. Whether you like the way it turns out or not is a completely different issue.

1 RP at 31.

DD continued to explain why he believed his prior attorneys had been ineffective, and he asked the juvenile court to assign him a new attorney so he could bring a motion for inadequate counsel. The Department responded that the issue regarding the agreed dependency order had already been decided by this court. Clay again interjected, stating that there was "more to it than that." 1 RP at 34. Specifically, Clay stated:

> [DD] is still upset over the [motion to vacate] issue, but there are subsequent issues that I think are relevant today, and that is the complete breakdown in communication between myself and my client.
>
> We were having communication difficulties prior to my first removal from the case, but since I was put back on, [DD]—and I have permission from him now to discuss these, and these were the concerns I was afraid, if we brought up, might prejudice him in some way, even though you are the trier of fact and can discriminate between what is and isn't relevant.
>
> . . . .
>
> But, he's refused to help me prepare for trial, prepare witness lists. He's blocked my [e-mails]. He's only communicated with me through my assistant, because he doesn't trust me. He wants paper trails. He's refused to meet with me privately. He's asked witnesses to be present and still alleges via declaration that there's a Bar complaint filed with the State Bar, so I am operating as his attorney under a Bar complaint, as well, apparently.
>
> So, those issues are more important today dealing with the issue of whether or not we should stay or whether or not I should be removed, what should happen.

1 RP at 34-35.

Clay informed the juvenile court that, during a recess, DD had asked him to make a request for him to speak with the judge without the Department present, as he had something to

8

No. 46504-3-II

disclose regarding a particular provider that might be helpful to the juvenile court in making a decision. The juvenile court asked DD if he had anything else to add, and DD responded, "I think that covers it." RP at 36. The juvenile court then denied DD's request for ex parte contact. It also denied his motion to remove Clay from the case and any motion to continue, stating:

> [I]f the Court of Appeals takes some sort of action, they can take some sort of action and stop us mid trial or combine whatever result happens with whatever appeal might be pending. I think this case is ready for trial, and I think we should proceed.

RP at 36-37.

### III. TERMINATION TRIAL

The termination trial commenced on June 4. Following the termination trial, the juvenile court found that the Department had proved all of the elements for termination under RCW 13.34.180(1) and that termination of DD's parental rights was in BD's best interests. The juvenile court entered an order terminating DD's parental rights as to BD. DD appealed the termination order to this Court, asserting that the juvenile court violated his right to counsel by ruling on the Department's records release motion while he was unrepresented, the juvenile court violated his right to effective assistance of counsel by denying his motion for new counsel, and his and BD's due process rights were violated by the guardian ad litem's (GAL) failure to conduct an independent investigation.

### IV. COMMISSIONER'S RULING

On February 5, 2015, a commissioner of this court entered a ruling affirming the juvenile court's order terminating DD's parental rights as to BD. The commissioner's ruling concluded in relevant part that (1) the juvenile court did not violate DD's due process right to counsel by ruling on the Department's records release motion while DD was unrepresented; (2) in the

9

alternative, any error in ruling on the Department's records release motion while DD was unrepresented was harmless beyond a reasonable doubt; and (3) the juvenile court properly denied DD's motion for substitute counsel.[5]

DD filed a motion to modify the commissioner's ruling, which motion we granted on April 22, 2015 to the extent necessary to refer the matter to a three judge panel. Following our review of DD's motion to modify and after hearing arguments from the parties, we deny DD's motion to modify the commissioner's ruling with respect to the issues regarding the GAL's conduct. We grant in part DD's motion to modify the commissioner's ruling with respect to the issues regarding (1) DD's right to counsel prior to the termination trial and (2) the juvenile court's denial of his motion for substitute counsel, which issues we address in this opinion. We affirm the juvenile court's order terminating DD's parental rights as to BD.

## ANALYSIS

### I. RIGHT TO COUNSEL

DD first contends that the juvenile court violated his statutory and due process right to counsel for a two week period prior to the termination trial. Specifically, DD contends that the juvenile court violated his right to counsel by releasing Clay from representation and subsequently ruling on the Department's record release motion while DD remained unrepresented. We agree with DD that the juvenile court violated his statutory right to counsel by ruling on the Department's motion while he was unrepresented by counsel, but we hold the violation harmless because the juvenile court's release of records had no impact on the

---

[5] The commissioner's ruling also concluded that DD's due process rights were not violated by the GAL's conduct in the case. Because we deny DD's motion to modify as it pertains to that portion of the commissioner's ruling, we do not further address it in this opinion.

termination proceedings. We need not reach the issue of whether DD's denial of counsel at the pretrial motion hearing amounted to a due process violation because, even assuming that a due process violation had occurred, the Department has shown such violation to be harmless beyond a reasonable doubt.

A.    *Statutory Right to Counsel in Parental Dependency/Termination Proceedings*

RCW 13.34.090 provides in relevant part:

> (1) *Any party* has a right to be represented by an attorney in *all proceedings* under this chapter. . . .
>     (2) At *all stages of a proceeding* in which a child is alleged to be dependent, the child's parent, guardian, or legal custodian *has the right to be represented by counsel*, and if indigent, to have counsel appointed for him or her by the court. Unless waived in court, counsel shall be provided to the child's parent, guardian, or legal custodian, if such person (a) has appeared in the proceeding or requested the court to appoint counsel and (b) is financially unable to obtain counsel because of indigency.

(Emphasis added). When interpreting a statute, our primary goal is to give effect to the legislature's intent. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 238, 237 P.3d 944 (2010). And "[w]here the statute's meaning is plain and unambiguous, we derive legislative intent from the statute's plain language." *In re L.N.B.-L.*, 157 Wn. App. at 238. Here, RCW 13.34.090's plain language unambiguously entitled DD to representation by counsel at the proceeding addressing the Department's records release motion. The Department does not argue to the contrary.

The Department, however, asserts that (1) by requesting the appointment of new counsel at the hearing to address the Department's records release motion, DD invited the juvenile court's error in ruling on the motion while DD was unrepresented, and (2) any error in ruling on the records release motion while DD was unrepresented was harmless beyond a reasonable

11

doubt. We reject the Department's assertion that DD invited the juvenile court's error, but we agree with the Department that the error was harmless beyond a reasonable doubt.

B.      *Invited Error*

The invited error doctrine prevents a party from obtaining relief on appeal from an error the party caused at trial. *Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 774, 320 P.3d 77 (2013), *review denied*, 180 Wn.2d 1026 (2014). The invited error doctrine applies when a party "takes affirmative and voluntary action that induces the trial court to take an action that party later challenges on appeal." *Grange Ins. Ass'n*, 179 Wn. App. at 774. Here, DD's action in requesting the appointment of new counsel did not induce the juvenile court to rule on the Department's motion while DD awaited the appointment of his new counsel. Moreover, DD clearly objected to the juvenile court ruling on the Department's motion while DD was unrepresented:

> [Commissioner]: . . . Do you wish to be heard on the records motion for the state to have those records provided to the state?
> [DD]: I um, I can't, I don't know if I am prepared to um, represent myself in that matter.
> [Commissioner]: I'm going to order that the records motion be granted. It may be subject to be revisited by another attorney at a later point in time, as the matter comes on for trial.
> [DD]: May I ask that it be stayed pending assignment of counsel?
> [Commissioner]: No. You may ask and I will deny it.

RP (April 17, 2014) at 7-8. We hold that DD did not invite the error he complains of on appeal.

C.     *Harmless Error*

   1. Inapplicability of Structural Error

   Before addressing harmless error, we consider whether such an analysis is appropriate here. DD argues that a violation of the right to counsel during a child termination proceeding constitutes structural error not subject to harmless error analysis. We disagree.

   A structural error is an error "'affecting the framework within which the trial proceeds'" and is "not subject to harmless error review." *State v. Frost*, 160 Wn.2d 765, 779, 161 P.3d 361 (2007) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)). "In contrast, trial errors—those affecting 'the trial process itself'—may be reviewed for harmless error." *Frost*, 160 Wn.2d at 779 (quoting *Fulminante*, 499 U.S. at 310). In the criminal context, where the right to counsel derives from the Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution, the denial of the right to counsel constitutes structural error not subject to harmless error analysis.[6] *See, e.g., United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006) (discussing structural defects not subject to harmless error analysis including the denial of counsel in criminal proceedings); *State v. Watt*, 160 Wn.2d 626, 632-33, 160 P.3d 640 (2007) (same); *see also State v. Harell*, 80 Wn. App. 802, 805, 911 P.2d 1034 (1996) ("An outright denial of the right to counsel is presumed prejudicial and warrants reversal without a harmless

---

[6] Article I, section 22 of our State Constitution provides the same protection of the right to counsel in criminal proceedings as the Sixth Amendment. *State v. Medlock*, 86 Wn. App. 89, 98-99, 935 P.2d 693 (1997).

error analysis."). DD's right to counsel in the termination proceedings, however, did not derive from the Sixth Amendment.

Several Washington cases have held or recognized that structural error does not apply to civil proceedings. For example, in *In re Detention of D.F.F.*, our Supreme Court addressed the appropriate remedy for a violation of the public trial right in a civil commitment proceeding under article I, section 10 of our State Constitution. 172 Wn.2d 37, 256 P.3d 357 (2011). Although four justices in the *D.F.F.* lead plurality opinion determined that a violation of the public trial right under article I, section 10 constituted structural error requiring reversal without a showing of prejudice, the two justices in the concurring opinion agreed with the three dissenting justices that "'structural error' analysis does not apply in the civil context." 172 Wn.2d at 48 (J.M. Johnson, J., concurring). Thus, a majority in *D.F.F.* determined that structural error analysis is inapplicable in the civil context.

Similarly, relying on *D.F.F.*, Division One of this court has held that structural error does not apply to a public trial violation in dependency and termination proceedings. *In re Adoption of M.S.M.-P.*, 181 Wn. App. 301, 313-14, 325 P.3d 392 (2014) (termination proceeding), *review granted*, 182 Wn.2d 1001 (2015); *In re Dependency of J.A.F.*, 168 Wn. App. 653, 663, 278 P.3d 673 (2012) (dependency proceeding). And, in a case predating *D.F.F.*, Division One of this court applied constitutional harmless error analysis to an alleged due process violation in a dependency proceeding. *In re Dependency of A.W.*, 53 Wn. App. 22, 27, 765 P.2d 307 (1988). Because no Washington case has applied structural error analysis in the civil context, we decline to do so here, and we hold that a violation of a right to counsel in pretrial termination proceedings does not require automatic reversal.

2. Harmless Error Analysis

We turn to whether DD's deprivation of counsel constituted harmless error. For purposes of our harmless error analysis, we assume without deciding that the juvenile court's error in ruling on the Department's motion while DD was unrepresented violated DD's due process right to counsel and, thus, apply the more stringent constitutional harmless error test.

We presume that constitutional errors are prejudicial and, to overcome this presumption, the State must prove beyond a reasonable doubt that the result of the proceedings would have been the same absent the error. *Watt*, 160 Wn.2d at 635. The Department argues that the juvenile court's error in ruling on its records release motion while DD was unrepresented was harmless beyond a reasonable doubt because (1) the Department already possessed several of the documents disclosed to it as a result of the juvenile court's order and (2) it was entitled to receive the remaining documents that were disclosed pursuant to the juvenile court's order. The Department thus asserts that the juvenile court's ruling on its records release motion while DD was unrepresented had no impact on the termination proceedings. We agree.

Here, the juvenile court's records release order: (1) released to the Department mental health records pertaining to DD that were possessed by five providers: Dr. Mark Whitehill, Dr. Loren McCollum, Social Treatment Opportunity Program, Foster Care Resource Network, and Greater Lakes Mental Health; (2) waived the confidentiality privilege for purposes of the termination trial; and (3) allowed treatment personnel to testify at the termination trial. As the record demonstrates, the Department already possessed several of the requested documents, including reports from Dr. Whitehill, Dr. McCollum, and the Social Treatment Opportunity Program and, thus, the portion of the juvenile court order releasing those documents had no

impact on the termination proceedings and was clearly harmless beyond a reasonable doubt. The release of documents from Foster Care Resource Network was similarly harmless beyond a reasonable doubt because it was the provider contracted by the Department to supervise DD's visitation with BD, and it did not owe DD a duty of confidentiality. Finally, prior to the records release order, DD signed a consent form allowing Greater Lakes Mental Health to release information to the Department and, thus, the order releasing records from Greater Lakes Mental Health was also harmless beyond a reasonable doubt.

DD contends that the portion of the order waiving confidentiality and allowing treatment providers to testify at the termination trial was not harmless beyond a reasonable doubt because the treatment providers testified at his termination trial. But DD provides no authority or argument that his communications with the treatment providers were privileged and, therefore, not admissible at his termination trial. Moreover, DD's December 14, 2011, agreed dependency order demonstrates that his communications with treatment providers were not privileged because the order required him to "sign a release of information for *all services providers* to provide information to the social worker and guardian ad litem." Ex. 5 at 6 (emphasis added).[7]

---

[7] After we heard arguments in this case, DD submitted a statement of additional authority citing RCW 5.60.060(9). RCW 5.60.060(9) provides in relevant part:

> A mental health counselor, independent clinical social worker, or marriage and family therapist . . . may not disclose, or be compelled to testify about, any information acquired from persons consulting the individual in a professional capacity when the information was necessary to enable the individual to render professional services to those persons except:
> (a) With the written authorization of that person. . . .

Because DD's agreed dependency order required him to authorize the release of information from all service providers, RCW 5.60.060(9)(a)'s exception to the mental health

Because the Department's requested records were either already in their possession or were subject to disclosure, and because DD's communications with treatment providers were not privileged, we are convinced beyond a reasonable doubt that the juvenile court's error in ruling on the Department's motion to release records and to allow treatment providers to testify at the termination hearing while DD was unrepresented was harmless. Because the error is harmless beyond a reasonable doubt, even assuming that DD's due process right to counsel was violated, reversal is not required.

## II. MOTION TO SUBSTITUTE COUNSEL

Next, DD contends that the trial court erred by denying his May 22, 2014, motion for the appointment of new counsel.[8] We disagree and, thus, affirm the juvenile court order terminating DD's parental rights as to BD.

When an attorney-client relationship completely collapses, the refusal to substitute new counsel violates the defendant's right to effective assistance. *State v. Cross*, 156 Wn.2d 580, 606, 132 P.3d 80 (2006). A defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as conflict of interest, an irreconcilable conflict, or a complete breakdown in communication. *State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997). "Generally, a defendant's loss of confidence or trust in his counsel is not sufficient reason to appoint new counsel." *State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139

---

professional-patient privilege applies. Additionally, to the extent DD relies on the physician-patient privilege under RCW 5.60.060(4), such privilege does not apply in parental termination proceedings. *In re Welfare of Dodge*, 29 Wn. App. 486, 491-94, 628 P.2d 1343 (1981).

[8] DD did not appeal from the juvenile court's May 1 decision to reinstate Clay as DD's counsel. We thus assume that the juvenile court properly determined that DD's relationship with Clay as of that date did not warrant the substitution of counsel.

(2004). *See also Cross*, 156 Wn.2d at 606 ("[T]here is a difference between a complete collapse and mere lack of accord."); *State v. Sinclair*, 46 Wn. App. 433, 436, 730 P.2d 742 (1986) (defendant's "general discomfort" with attorney's representation did not constitute a valid reason to substitute counsel).

In determining whether the juvenile court properly denied DD's motion to substitute counsel, we must consider: (1) the extent of the conflict, (2) the adequacy of the juvenile court's inquiry, and (3) the timeliness of the motion. *In re Personal Restraint of Stenson*, 142 Wn.2d 710, 723-24, 16 P.3d 1 (2001). We review the juvenile court's refusal to appoint new counsel for an abuse of discretion. *Cross*, 156 Wn.2d at 607. A court abuses its discretion when its decision adopts a view that no reasonable person would take or is based on untenable grounds or reasons. *State v. Sisouvanh*, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

A.    *Extent of Conflict*

In examining the extent of the conflict between counsel and client, we consider "the extent and nature of the breakdown in the relationship and its effect on the representation actually presented." *State v. Schaller*, 143 Wn. App. 258, 270, 177 P.3d 1139 (2007). "Because the purpose of providing assistance of counsel is to ensure . . . a fair trial, the appropriate inquiry necessarily must focus on the adversarial process, not only on the [client's] relationship with his lawyer . . . ." *Shaller*, 143 Wn. App. at 270.

At the June 4 hearing addressing Clay's representation, DD first argued in support of his motion for substitute counsel that Clay, like several of his other previously assigned attorneys, had failed to argue previous issues in a timely fashion. Specifically, DD stated to the juvenile court that "[e]ach time I've had a new attorney, I've had to wait for them all to prepare and have

issues get heard before the Court. I've had to give them an amount of time before even trying to file any complaints or a follow-up with supervisors." 1 RP at 26. DD's general dissatisfaction with the amount of time counsel needed to prepare to represent him in the termination proceedings is not a valid basis to warrant the appointment of substitute counsel, particularly since DD failed to show any prejudice resulting from counsel's required preparation time. *Varga*, 151 Wn.2d at 200. DD also raised several issues regarding the quality of representation from his previous attorneys, particularly with regard to a motion to vacate the agreed order of dependency, but these issues were not relevant to the quality of Clay's representation or the extent of the conflict between DD and Clay.

Additionally, at the June 4 hearing Clay told the juvenile court that there was a complete communication breakdown because DD has refused to help him prepare for trial and has refused to communicate directly with him. But "[i]t is well settled that a defendant is not entitled to demand a reassignment of counsel on the basis of a breakdown in communications where he simply refuses to cooperate with his attorney[.]" *Schaller*, 143 Wn. App. at 271. At best, Clay's assertion at the June 4 hearing showed that the alleged communication breakdown was based solely on DD's refusal to cooperate. And, although Clay asserted that DD had refused to help him prepare for trial, at no point did Clay state that he was unprepared for trial due to DD's lack of cooperation.

Finally, Clay asserted a conflict of interest based on DD's filing of a bar complaint against him. But to establish reversible error based upon an allegation of a conflict of interest, DD must "demonstrate that counsel *actively* represented conflicting interests and that an actual conflict of interest *adversely affected* his lawyer's performance." *State v. Martinez*, 53 Wn. App.

709, 715-16, 770 P.2d 646. Although DD's bar complaint is not in the record before us, the record suggests that the complaint centered on Clay's filing of the motion to vacate the agreed dependency order and other trial tactics. But "[c]ase law does not support the application of the concept of a conflict of interest to conflicts between an attorney and client over trial strategy." *In re Stenson*, 142 Wn.2d at 722. Accordingly, DD did not demonstrate at the June 4 hearing that he and Clay had a complete communication breakdown or a conflict of interest warranting the substitution of counsel.

B.     *Trial Court Inquiry*

"[A] trial court conducts an adequate inquiry by allowing the defendant and counsel to express their concerns fully." *Schaller*, 143 Wn. App. at 271. Here, the record clearly demonstrates that the juvenile court asked DD why he felt substitute counsel was necessary and attempted to clarify DD's reasons on multiple occasions. DD expressed that he needed new counsel to help him bring an ineffective assistance claim against Clay, as he was unhappy about the way Clay handled certain aspects of the case. The juvenile court also heard from Clay regarding DD's concerns. Following Clay's description of the issue, DD confirmed that Clay had stated his concerns fairly. Finally, the juvenile court heard Clay's description of the communication breakdown and asked DD if he wanted to add anything, to which DD responded, "I think that covers it." 1 RP at 36. Based on the record, we conclude that the juvenile court conducted an adequate inquiry.

C.     *Timeliness of Motion*

DD argues that his motion for substitute counsel was timely because he initially asked for a new attorney on April 17. He asserts that it was necessary to renew his request on June 4—the

20

No. 46504-3-II

first day of the termination trial—because the juvenile court reinstated Clay on May 1 and he missed the hearing on May 21. Regardless of whether DD's motion for substitute counsel was timely, the juvenile court here did not abuse its discretion in denying DD's motion based on the above two factors. Accordingly, we affirm the juvenile court's decision to deny DD's motion for substitute counsel.

Because the juvenile court's error in ruling on the Department's records release motion while DD was unrepresented was harmless beyond a reasonable doubt, and because the juvenile court did not abuse its discretion by denying DD's motion for substitute counsel, we affirm the order terminating DD's parental rights as to BD.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, P.J.

We concur:

Maxa, J.

Lee, J.

21