IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　Respondent,<br><br>　　　　v.<br><br>BRANDON LEE HOLMES,<br><br>　　　　　　Appellant. | No. 84127-1-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

HAZELRIGG, A.C.J. — Brandon Holmes appeals from a conviction for one count of rape of a child in the second degree. He raises numerous constitutional claims on appeal, arguing that he was deprived of the right to counsel, the right to a fair trial, and the right to be present and testify. While Holmes' various arguments are largely without merit and we affirm his conviction, the sentencing court did miscalculate his offender score based on an out-of-state conviction, and thus, remand is required for recalculation and resentencing.

FACTS

On September 28, 2018, the State charged Brandon Holmes with one count of rape of a child in the third degree. Before trial, the State amended the information to one count of rape of a child in the second degree and alleged that, between June 1 and August 29, 2018, Holmes had sexual intercourse with J who was 13 years old at the time.

Holmes' first appointed attorney, Karim Merchant, withdrew due to conflict. Thereafter, Holmes moved to discharge his second appointed attorney, Harry Steinmetz. While the trial court noted that it heard nothing from Holmes that would require a new attorney, it nonetheless exercised its discretion to grant the motion and stated, "[W]e'll give you a chance with someone else, and hopefully that'll be a better fit for you." On April 23, 2019, the King County Department of Public Defense assigned Abigail Cromwell to Holmes' case. Approximately five months later, Holmes moved to discharge Cromwell. The trial court noted that there was "room for additional or improved communication" between Holmes and Cromwell, but found there was not such a breakdown in communication to necessitate appointment of new counsel and denied the motion to discharge.

The next day, Cromwell moved to withdraw as counsel "due to professional considerations preventing [her] continued representation." At the hearing on the motion, Cromwell asserted there was "a total breakdown in communication" and explained that many of her conversations with Holmes ended either in Holmes hanging up or walking away. Holmes responded by asserting that Cromwell was lying: "I have never hung up the phone, never walked away, ever. That is a flat-out lie." The court denied counsel's motion to withdraw but said that it would consider further information submitted on the issue. Cromwell filed a supplemental motion and the trial court authorized her withdrawal on October 15, 2019.

Jerry Stimmel then became Holmes' fourth court-appointed attorney. Due to the COVID-19[1] pandemic, the trial was delayed several times and ultimately set

---

[1] 2019 novel coronavirus infectious disease.

for March 22, 2022. On the morning that trial was scheduled to begin, Holmes moved to discharge Stimmel and sought the appointment of yet another attorney. Holmes addressed the court and alleged that Stimmel was not prepared and expressed concern about "the way [they] communicate" with each other. The court denied the motion. In doing so, the court emphasized that they were "here on the day of the trial; today's the trial date." Further, the court reasoned that Stimmel had been representing Holmes since November of 2019, noted the case was already four years old, referenced the significant delay that would result from assigning new counsel, and stated that "given the record I've just outlined, it appears to the [c]ourt that there [are] strategic reasons to not move this case forward."

On April 14, 2022, the jury trial began and the parties provided opening statements. Testimony established that Peggy Toves and Holmes began dating in 2014. In 2016, they moved from California to Washington with Toves' two daughters, J (born in August 2004) and H. They lived with Holmes' parents until 2018 when they moved into a small motel room in Federal Way. While the family was staying in Federal Way, Holmes and Toves had a child together, A.

J recalled that in 2018 she was comfortable talking with Holmes about various things and felt that he listened to her. J testified that Holmes would tell her and H to call him "dad" and he would give them advice; J confirmed that she trusted Holmes. By May of 2018, however, J stated that Holmes told her that he and Toves were fighting "because he wanted to have a threesome and [her] mother didn't." She also explained that Holmes talked about her vagina and told her "the

reason [her] mom was so angry was because she didn't masturbate." J stated that this made her feel "uncomfortable," "weirded out, [and] confused." When J was 13, the summer before she started high school, she took a bath after volleyball tryouts and Holmes walked into the bathroom, "peeked his head" around the curtain, and looked at her. According to J, she "was naked and [Holmes] was looking at [her] . . . while [she] was in the bathtub." When Holmes walked out of the bathroom, J recalled hearing Toves and Holmes "laughing about it."

J also testified that, when she was 13, Holmes took her to a smoke shop in Tacoma to get marijuana. During the drive, Holmes began talking "about sex." J stated that she started to cry when Holmes told her "that he wanted [her] to have an orgasm and that he wanted to be the one to give [her] that." Holmes then tried to show J a pornographic video and "he got upset" because J did not want to watch it. When the two returned to the motel, J testified, Holmes gave her marijuana and she "threw up" after she smoked it. J stated that Holmes then pulled up the pornographic video on his phone, handed the phone to her, and told her to "go into the bathroom and not to argue and just watch it." J felt scared and went into the bathroom with the phone and just sat on the floor and closed her eyes. According to J, Holmes then walked into the bathroom, turned off the lights, and "grabbed [her] hand and guided [her] hand to [her] vagina and started moving [her] hand in circular motions." Holmes also put his "finger inside of [J's] vagina." J told Holmes to "stop" and he turned the light on and "asked if [J] was okay." After Holmes left the bathroom, J went to the bed and Holmes then asked her to come outside with him so they could talk. Holmes asked J whether she was going to tell her mom

and she answered, "Yes." In response, J testified, "[Holmes] asked me to let him know when I was gonna tell my mom so that way he can pack his bags and say goodbye to my brother so that we—because he said that we weren't gonna see him ever again."

J did not immediately disclose the incident to anyone, but shortly afterward, she visited Holmes' sister, Catrina Holmes,[2] and reluctantly told Catrina what had occurred in the bathroom. Catrina and Holmes' other sister, Valerie, told Toves what J had disclosed and took the children along with Toves to Holmes' parent's house, and later to Catrina's house. When Toves took the children to return to Holmes, Valerie called Child Protective Services and Holmes was ultimately arrested. Holmes testified in his own defense and denied ever touching J as she had described and further stated that he had never taken her to get marijuana.

At the conclusion of trial, the jury found Holmes guilty as charged. The trial court imposed an indeterminate sentence with a minimum of 108 months' confinement up to a maximum term of life in prison. The court also imposed the $500 victim penalty assessment (VPA) and $100 DNA collection fee, but noted that all "non-mandatory fines or fees waived."

Holmes timely appealed.

---

[2] Because they share the same last name as Holmes, we refer to both of his sisters by their first names for clarity. No disrespect is intended.

ANALYSIS

I.    Claim of Complete Denial of Counsel

Holmes assigns error to the trial court's denial of his motion to discharge Stimmel as his attorney, which, he avers, violated his constitutional right to "conflict-free counsel."

As a preliminary matter, Holmes' briefing reflects fundamental misunderstandings of the law and fails to separate clearly distinct legal concepts for proper consideration.  First, it is well established that "conflict-free counsel" refers to "counsel free from conflicts of interest."  *State v. Reeder*, 181 Wn. App. 897, 908, 330 P.3d 786 (2014), *aff'd*, 184 Wn.2d 805, 365 P.3d 1243 (2015); *State v. Davis*, 141 Wn.2d 798, 860, 10 P.3d 977 (2000).  While Holmes frames this issue in both the assignment of error and his argument in briefing as a deprivation of his "right to conflict-free counsel," he makes no attempt to show that his attorney had an actual conflict of interest.[3]  Second, "conflicts of interest" and "irreconcilable conflicts" are separate concepts that require different analyses.  *United States v. Moore*, 159 F.3d 1154, 1157-58 (9th Cir. 1998); *see also In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 721-22, 16 P.3d 1 (2001) (*Stenson* II).  Confoundingly, Holmes cites to *Stenson* II in his opening brief for a rule statement in which he conjoins those distinct categories into one that he then refers to as an "irreconcilable conflict of interest."[4]    Third, a "complete breakdown in

---

[3] "To establish that an actual conflict of interest deprived him of effective assistance of counsel, [the defendant] must show both that [their] attorney had a conflict of interest and that the conflict adversely affected counsel's performance." *Reeder*, 181 Wn. App. at 909.

[4] At oral argument before this court, Holmes' counsel was asked where the phrase "irreconcilable conflict of interest" came from and what type of conflict he was alleging, to which defense counsel responded, "the key basis of the request to discharge counsel was the breakdown in communications." Wash. Ct. of Appeals oral argument, *State v. Holmes*, No. 84127-1-I (Mar. 7,

communication" and an "irreconcilable conflict" are also separate grounds to move for substitution of counsel. *See State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997) (*Stenson* I). Again, Holmes blends these together and asserts that the "breakdown in communications" with his counsel "constituted an irreconcilable conflict." Then, he avers reversal is required due to the "complete breakdown in communication." Regardless of the specific basis, Holmes ultimately asserts that he was completely denied his right to the assistance of counsel under the Sixth Amendment to the United States Constitution.

Whether to grant a defendant's motion for new court-appointed counsel is a decision within the discretion of the trial court. *Stenson* I, 132 Wn.2d at 733. On a motion to substitute counsel, courts are to consider "(1) the reasons given for the dissatisfaction, (2) the court's own evaluation of counsel, and (3) the effect of any substitution upon the scheduled proceedings." *Id*. at 734. This court reviews the denial of a defendant's motion for new appointed counsel under an abuse of discretion standard. *State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139 (2004). "Discretion is abused if the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." *State v. Vermillion*, 112 Wn. App. 844, 855, 51 P.3d 188 (2002).

While the Sixth Amendment guarantees all accused persons the right to assistance of counsel, it provides neither an absolute right to choose a particular

---

2024), at 2 min., 7 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024031201/?eventID=2024031201.

On rebuttal, in an apparent attempt to provide an answer to the question posed, defense counsel stated that *United States v. Nguyen*, 262 F.3d 998 (9th Cir. 2001), "equat[ed] a communications breakdown with an irreconcilable conflict." Wash. Ct. of Appeals oral argument, *supra*, at 19 min., 2 sec. The question regarding "irreconcilable conflict of interest" remained unanswered; *Nguyen* does not mention "irreconcilable conflicts" nor "conflicts of interest."

court-appointed counsel nor any right to have a "meaningful relationship" with appointed counsel. *Wheat v. United States*, 486 U.S. 153, 158, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988); *Stenson* I, 132 Wn.2d at 733; *Morris v. Slappy*, 461 U.S. 1, 14, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983). "[T]he right to effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." *United States v. Cronic*, 466 U.S. 648, 658, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Thus, "the Sixth Amendment is not implicated absent an effect of the challenged conduct on the reliability of the trial process." *State v. McCabe*, 25 Wn. App. 2d 456, 461, 523 P.3d 271, *review denied*, 1 Wn.3d 1014 (2023). "There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658. One example is "the complete denial of counsel." *Id.* at 659.

In order to obtain a different appointed attorney, a defendant "must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *State v. Schaller*, 143 Wn. App. 258, 267-68, 177 P.3d 1139 (2007). Holmes contends that he and Stimmel had an "irreconcilable conflict," which "occurs when the breakdown of the relationship results in the complete denial of counsel." *Id.* at 268. "A defendant need not show prejudice when the breakdown of a relationship between attorney and defendant from irreconcilable differences results in the complete denial of counsel." *Stenson* II, 142 Wn.2d at 722. To determine whether an irreconcilable conflict exists, this court

considers "(1) the extent of the conflict, (2) the adequacy of the inquiry, and (3) the timeliness of the motion." *Id.* at 724.

Looking at the conflict, "this court considers the extent and nature of the breakdown in the relationship and its effect on the representation actually presented." *Schaller*, 143 Wn. App. at 270. Prejudice is presumed when representation is inadequate. *Stenson* II, 142 Wn.2d at 724.

On the day trial was scheduled to begin, Stimmel told the judge that Holmes "desire[d] to discharge [him]." Stimmel noted that it "ha[d] been a very difficult month" and their "communication ha[d] really broken down." He concluded, "[Holmes] would like to fire me, and I would like to be fired or—or withdraw under the circumstances." The trial court then turned to Holmes and the following exchange occurred:

> [HOLMES]: Uhm, my motion is I guess an agreement to discharge—or in agreements with my lawyer, to discharge my lawyer. Uhm, we have tried to look for different ways to work with one another. And do—I don't know the exact penal codes or the-the exact statutes, but I do not believe I have good counsel in the form of, for one, the way we communicate, the actual work or things that have been done or addressed. There have been a number of things, even when it comes to the—to the choice I can make between a trial or taking a deal. On one side, the deal, we have not properly sat down and went through every single thing that is involved in the deal. I've had questions from the time he's been my lawyer, questions that have not been addressed, questions that have—have left me, uh, between a rock and a hard place between going to trial with an individual who hasn't—doesn't even know certain facts of my case. He—we've talked about certain facts of my case. He doesn't know certain defense strategies, certain communications. Uh, I don't believe I have somebody who's unbiased. I believe I have somebody who, if I go to trial, it's been said in so many words that it's not going to be too much assistance or help for even proper protocol and procedures, strategies, or anything of the sort. When it comes up to—since 2020, he's been [] my lawyer, and I feel like I'm placed between the—the urgency to go to trial or make a decision. But, my

- 9 -

counsel has expressed just now for the [c]ourt, previously for the courts, and in the past documentations and records from me and him before that he is not the one that's ready. He is not prepared. He is not—we are at a—at a strong standstill, sir, and I feel like I will be—I will set myself up to fail if I go to trial or take a deal with the counsel that I have.

THE COURT: Thank you, Mr. Holmes. The record before the [c]ourt is that you were arraigned in October of 2018. You had counsel. That counsel and you had difficulties, and there w[ere] discussions about changing counsel. Initially that was denied and—and then eventually granted. You've had Mr. Stimmel here since November of 2019. And we are here on the day of the trial; today's the trial date.
      The [c]ourt is not inclined to discharge [c]ounsel. You have the right to have competent counsel. Mr. Stimmel is competent. He will act ethically and try the case appropriately. I have complete confidence in that. If there's something that happens during trial, we'll address it at that time.
      In terms of what the [c]ourt has been saying for the last few months, this case has to go to trial given the age of the case. And so, I expect it to go to trial. If you are firing Mr. Stimmel to represent yourself, that's one thing. We'll have a discussion about that. If you're asking for a new counsel at this late date for an attorney to get up to speed for a case that is four years old, that is unreasonable. It would mean [] a delay of the case for a lengthy period of time. Again, the [c]ourt has to make decisions based on the need of [c]ounsel to be able to communicate with their client, the need of [c]ounsel to be prepared to go forward on the case, and any other concerns the [c]ourt is worried about.
      In this case, given the record I've just outlined, it appears to the [c]ourt that there is strategic reasons to not move this case forward. And so, the [c]ourt is going to deny the motion to discharge [c]ounsel.

The case proceeded to trial with Stimmel representing Holmes and no further issues or complaints were raised by either of them.

In *Stenson* II, the court rejected a denial of counsel claim based on an alleged irreconcilable conflict between Stenson and his attorney that continued throughout trial.  142 Wn.2d at 732.  Stenson moved to substitute his counsel after nearly three weeks of jury selection and argued that one of his attorneys "spent

virtually no time preparing for the jury trial." *Id.* 726-27. He insisted that his "attorneys refused to investigate things he and his family thought were important to the case." *Id.* at 727. According to Stenson, his counsel "visited him in prison fewer than 10 times in 10 months," he "could never get through to [counsel] on the phone" and his "[attorney's] office stopped receiving his calls." *Id.* After the court denied Stenson's motion for new counsel, his attorney moved to withdraw 10 days into trial. *Id.* at 728-29. Defense counsel explained that he "felt he did not have an attorney-client relationship with Stenson," he was "extremely frustrated with [Stenson] to the point of really not wanting to go on with this case," and stated, "Quite frankly, I can't stand the sight of him." *Id.* at 729. Stenson "continued to complain about a lack of communication and was upset that counsel had visited him only twice during the three-week duration of trial." *Id.* On review, our Supreme Court explained that "it does not appear that the extent of the conflict was very great or the breakdown in communication very severe." *Id.* at 731. Not only did the court determine there was "no reason to believe that an irreconcilable conflict between Stenson and his counsel existed," it also plainly held that the circumstances "*d*[*id*] *not come close* to constituting denial of counsel." *Id.* at 732 (emphasis added).

Here, unlike in *Stenson* II, the conflict between Holmes and Stimmel did not continue into trial; the record shows no further requests from Holmes or Stimmel to discharge or withdraw, respectively. Moreover, the extent of the conflict in *Stenson* II resulted in counsel stating that he did not believe he had an attorney-client relationship with Stenson and also that he could not stand the sight of him.

- 11 -

Here, however, Holmes merely noted, "I do not believe I have good counsel in the form of, for one the way we communicate." The difference as to the level of these respective disputes is plain on its face. While Holmes insists that Stimmel was "not prepared," this contention is belied by the record and the fact that Holmes never raised another concern based on his counsel's performance. Nothing in the record before us reaches the level of the dispute in *Stenson* II.

It is noteworthy that Holmes does *not* contend Stimmel was ineffective as counsel. Further, while he alleges that Stimmel "had not answered his questions, was not prepared, did not know the facts of the case, and did not know about defense strategies" before trial began, Holmes does not point to *anything* that Stimmel did or failed to do during the course of trial that could have constituted inadequate representation. This omission makes sense as the record shows that Stimmel provided Holmes' with adequate representation during trial. Stimmel engaged in voir dire and questioned potential jurors, filed motions in limine to exclude certain testimony of various witnesses and other evidence, cross-examined officers in the CrR 3.5 hearing and argued for suppression of Holmes' statements, presented the defense theory of the case during opening statement and closing argument, conducted cross-examinations of numerous State witnesses, and made objections throughout trial. While it is clear that Holmes was concerned about the way he and Stimmel communicated, as well as Stimmel's general preparation for trial and knowledge of "defense strategies," the record does not show a serious conflict between the two nor any impact on the representation Holmes actually received at trial. *See State v. Svikel*, No. 83649-8-I, slip op. at 7

(Wash. Ct. App. Mar. 27, 2023) (unpublished) ("It necessarily follows that when counsel's representation results in an adequate defense having been presented, the defendant has not been completely deprived of his right to counsel."), https://www.courts.wa.gov/opinions/pdf/836498.pdf.[5]

As to the adequacy of the trial court's inquiry in response to Holmes' motion to discharge counsel, we have held that the "trial court conducts adequate inquiry by allowing the defendant and counsel to express their concerns fully." *Schaller*, 143 Wn. App. at 271. Here, the trial court allowed Holmes and Stimmel to express their concerns completely. While Holmes cites to *Stenson* II, in which the court held an in-camera hearing, the record before us does not reflect the same level of conflict and/or necessity for such a hearing. We have made clear that when the defendant asserts his reasons for dissatisfaction on the record, formal inquiry is not always necessary. *Schaller*, 143 Wn. App. at 272. Here, Holmes was provided ample opportunity to share his concerns and did so. The trial court also assured Holmes that if "there's something that happens during trial, we'll address it at that time." As the record shows, Holmes did not feel the need to address this matter again.

Turning next to the timeliness of Holmes' motion, he moved to discharge Stimmel on the day trial was set to begin. According to Holmes, the "motion was timely under the circumstances," and "[a]lthough the motion was made close to trial, it was based on [] Stimmel's failure to work on [his] case." Even at oral

---

[5] This opinion is unpublished and cited pursuant to GR 14.1(c) as necessary for a well-reasoned opinion. Because of the factual similarities with the instant case, we expressly adopt the sound reasoning articulated in *Svikel*.

argument before this court, defense counsel claimed that the timing of the motion "doesn't weigh against [Holmes] because the delay was entirely attributable to [] Stimmel."[6] Such a characterization paints Holmes as a client without autonomy to express concerns regarding his attorney-client relationship, which is blatantly contradicted by the record, especially the fact that he raised similar issues with numerous other attorneys who had represented him in this case before trial. As our Supreme Court held in *Stenson* II, "'where the request for change of counsel comes during the trial, or on the eve of trial, the [c]ourt may, in the exercise of its sound discretion, refuse to delay the trial to obtain new counsel and therefore may reject the request.'" 142 Wn.2d at 732 (quoting *United States v. Williams*, 594 F.2d 1258, 1260-61 (9th Cir. 1979)).

As none of the factors set out in *Stenson* II support a conclusion that there was an irreconcilable conflict between Holmes and Stimmel, we reject this claim. Just like those in *Stenson* II, these facts do not come close to constituting a complete denial of counsel under the Sixth Amendment. Because the denial of Holmes' last-minute motion for new counsel was based on tenable grounds, the trial court did not abuse its discretion.

II.     Trial Irregularity Concerning Potential COVID-19 Exposure

Holmes contends he was deprived of his right to a fair trial because the jury discovered that Toves, who lived with him, tested positive for COVID-19 leading jurors to inquire about whether Holmes had exposed them to the disease during trial.

---

[6] Wash. Ct. of Appeals oral argument, *supra*, at 21 min., 30 sec.

Trial irregularities are those that occur during a criminal trial and "implicate the defendant's due process rights to a fair trial." *State v. Davenport*, 100 Wn.2d 757, 761 n.1, 675 P.2d 1213 (1984). In ascertaining whether the defendant received a fair trial, we "look to the trial irregularity and determine whether it may have influenced the jury." *Id*. An irregularity necessitates a new trial when it is so prejudicial that "'nothing short of a new trial can insure that the defendant will be tried fairly.'" *State v. Lupastean*, 200 Wn.2d 26, 36, 513 P.3d 781 (2022) (quoting *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010)).

The Sunday night before Toves was scheduled to testify, she informed the prosecutor that she had tested positive for COVID-19. Defense counsel was made aware of this on the same day as the prosecutor. On Monday, the State moved to allow Toves to testify remotely on the following day and, with no objection from Holmes, the court granted the motion based on a finding of extraordinary circumstances.

Prior to her testimony, the trial court told the jury: "Toves is ill and cannot safely come to court. And so, I've made a ruling allowing her to testify via Zoom[7] audio and video link. So, please consider her testimony the same way you would consider the testimony of any other witness." During direct examination, the prosecutor had the following exchange with Toves regarding her health and housing status:

> [STATE:] And Ms. Toves, you were initially supposed to come in in person yesterday; is that right?
>
> [TOVES:] That is right.

---

[7] "Zoom" is an internet-based videoconferencing platform.

[STATE:] But, you're not feeling so good, and under the circumstances we're—we're having you call in; is that right?

[TOVES:] That is correct.

[STATE:] Okay. Thank you very much for doing that. And Ms. Toves how—how old are you?

[TOVES:] I'm 37.

[STATE:] And where do you currently live?

[TOVES:] In Auburn.

[STATE:] And who do you live with?

[TOVES:] With Brandon.

[STATE:] And who—

[TOVES:] Holmes.

[STATE:] Brandon Holmes? And do you live with anyone else?

[TOVES:] No.

[STATE:] How long have you lived there?

[TOVES:] Say a couple months.

The prosecutor did not elicit any testimony from Toves concerning her contraction of COVID-19. At the beginning of cross-examination, however, Holmes immediately directed his questions to Toves' illness:

[DEFENSE:] Ms. Toves, do you have any objection to our reviewing to the—the jury what the nature of your illness is?

[TOVES:] No, I don't have any objection.

[DEFENSE:] You positive about that?

[TOVES:] Yes.

[DEFENSE:] You sure that's okay?

[TOVES:] About what—okay.

[DEFENSE:] Just—just to tell the jury what your sickness is?

[TOVES:] My—oh, COVID?

[DEFENSE:] Yes.

[TOVES:] Tested positive for COVID.

Outside the presence of the jury, when the court expressed concern about not being notified that Holmes lived with Toves and was exposed to COVID-19, defense counsel apologized and informed the court that Holmes had taken a COVID-19 test the night before Toves was originally scheduled to testify and "it was negative for him." Though defense counsel knew Toves and Holmes lived together, the prosecutor "wasn't sure of that until [they] began the testimony." After Toves' testimony concluded and the jury had heard that she had COVID-19 and lived with Holmes, three jurors asked the bailiff whether Holmes had been tested for the virus. Before trial the following day, Holmes took a COVID-19 test, which was negative. To promptly address the jurors' concerns, the court informed the jury that Holmes had taken two COVID-19 tests, both with negative results.

Invited Error Doctrine

The invited error doctrine provides that "a party who sets up an error at trial cannot claim that very action as error on appeal and receive a new trial." *State v. Momah*, 167 Wn.2d 140, 153, 217 P.3d 321 (2009). The doctrine "'precludes a criminal defendant from seeking appellate review of an error they helped create, even when the alleged error involves constitutional rights.'" *State v. Tatum*, 23

- 17 -

Wn. App. 2d 123, 128, 514 P.3d 763, *review denied*, 200 Wn.2d 1021 (2022) (quoting *State v. Carson*, 179 Wn. App. 961, 973, 320 P.3d 185 (2014)). "To be invited, the error must be the result of an affirmative, knowing, and voluntary act." *State v. Mercado*, 181 Wn. App. 624, 630, 326 P.3d 154 (2014). The doctrine applies to testimony that is directly elicited by the defense. *See State v. McPherson*, 111 Wn. App. 747, 764, 46 P.3d 284 (2002); *State v. Vandiver*, 21 Wn. App. 269, 273, 584 P.2d 978 (1978).

Here, Holmes knowingly and deliberately elicited Toves' testimony concerning her COVID-19 diagnosis shortly after she had testified on direct examination that she resided with Holmes. Because the alleged error was set up by Holmes and that information was revealed to the jury only by the defense through its cross-examination, the invited error doctrine applies and precludes appellate review of this issue. *Mercado*, 181 Wn. App. at 630; *Vandiver*, 21 Wn. App. at 273.

III. Tailoring Argument During Cross-Examination

Holmes asserts that, during cross-examination, the prosecutor suggested he tailored his testimony which deprived him of his constitutional rights to both appear and testify. Because Holmes did not object to the prosecutor's tailoring argument during cross-examination and he fails to address the heightened standard of prejudice applicable on appeal, his claim is waived.

Under the Sixth Amendment and article I, section 22 of our state constitution, criminal defendants have "the right to 'appear and defend in person,'

to testify on [their] own behalf, and to confront witnesses against [them]." *State v. Berube*, 171 Wn. App. 103, 114, 286 P.3d 402 (2012).

"A claim of 'tailoring' alleges that the defendant conformed their testimony to the evidence they observed while attending trial." *State v. Carte*, 27 Wn. App. 2d 861, 871, 534 P.3d 378 (2023), *review denied*, 2 Wn.3d 1017 (2024). Tailoring arguments are either "specific" or "generic." *Id.* They are "specific" when "derived from the defendant's actual testimony" and "generic" when "based solely on the defendant's presence at the proceeding." *Id.*

Tailoring arguments do not violate a defendant's Sixth Amendment right to be present. *See Portuondo v. Agard*, 529 U.S. 61, 73, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000). However, article I, section 22 is analyzed independently of the Sixth Amendment and while specific tailoring arguments do not violate our state constitution, generic tailoring arguments do. *State v. Martin*, 171 Wn.2d 521, 533, 535-36, 252 P.3d 872 (2011); *State v. Wallin*, 166 Wn. App. 364, 376, 269 P.3d 1072 (2012). While we have extensive case law detailing the constitutionality of, and test for both specific and generic tailoring, Holmes encounters a procedural bar to review of this issue.

When the defendant fails to object at trial, the alleged tailoring violation is waived unless the defendant "demonstrate[s] that the error was flagrant, ill intentioned, and uncurable." *Carte*, 27 Wn. App. 2d at 870. "After error has been established, the defendant must show prejudice." *Id.* at 874. Here, Holmes did not object during cross-examination and thus he must establish the heightened standard of prejudice. To do so, he is required to show that "(1) no curative

instruction could have eliminated the prejudicial effect and (2) there was a substantial likelihood the misconduct led to prejudice that affected the jury verdict." *Id.* at 874.

Holmes makes no attempt to meet this standard. Instead of following the applicable standard this court set out in *Carte*, he requests that we apply the constitutional harmless error standard and place the burden on the State to show the absence of prejudice beyond a reasonable doubt. He also asks this court to "stay this case until *Carte* is resolved on the merits," asserting that our Supreme Court will likely grant review. But the court has since denied review of *Carte* and that case is controlling. Thus, even assuming arguendo that the prosecutor's tailoring argument here was an improper generic tailoring accusation, Holmes' claim fails. *Carte*, 27 Wn. App. 2d at 870. Because Holmes provides no argument as to the heightened standard of prejudice and he has the burden to make the showing, this claim is waived. *See id.; In re Det. of Rushton*, 190 Wn. App. 358, 373, 359 P.3d 935 (2015) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

IV.     Miscalculation of Offender Score

Holmes next avers that remand for resentencing is required as the trial court erred by including his prior California burglary conviction in his offender score. The State agrees.

This court reviews the calculation of a defendant's offender score de novo. *State v. Olsen,* 180 Wn.2d 468, 472, 325 P.3d 187 (2014). "The offender score is the sum of points accrued as a result of prior convictions." *Id.*; RCW 9.94A.525.

"Out-of-state convictions count toward that score if the trial court determines them to be comparable." *State v. Davis*, 3 Wn. App. 2d 763, 771, 418 P.3d 199 (2018). "The comparability analysis has two steps, one legal and the other factual." *Id.* at 772. Under the legal comparability step, "the elements of the out-of-state crime must be compared to the elements of Washington criminal statutes." *State v. Morley*, 134 Wn.2d 588, 606, 952 P.2d 167 (1998). Pursuant to the factual comparability inquiry, the court must determine "whether the defendant's conduct would have violated the comparable Washington statute." *Olsen*, 180 Wn.2d at 473.

Here, the trial court included Holmes' California burglary conviction in calculating his offender score based on the State's argument that it was comparable to a Washington conviction of burglary in the second degree, a class B felony. This was erroneous. First, the crime of burglary as defined in California is not legally comparable to burglary in Washington. *Davis*, 3 Wn. App. 2d at 772. Second, as the State concedes in briefing, Holmes' California burglary conviction was not factually comparable to a Washington burglary conviction. Because the trial court miscalculated Holmes' offender score based on its erroneous inclusion of the California burglary conviction, we remand for recalculation of his offender score and resentencing based on a proper score.[8] *See State v. Shelley*, 3. Wn. App. 2d 196, 203, 414 P.3d 1153 (2018).

---

[8] Holmes' last assignment of error is to the imposition of the $500 VPA. As resentencing is required, we need not reach this issue.

V.      Facial Challenge To Condition of Community Custody

Next, Holmes assigns error to the trial court's imposition of a condition of community custody that requires him to consent to random searches by the Department of Corrections (DOC).  The State asserts that this issue is not ripe for review.  We agree with the State.

The judgment and sentence included a special condition requiring Holmes to "[c]onsent to DOC home visits to monitor compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which the offender lives or has exclusive/joint control/access."

A preenforcement challenge to a community custody condition is ripe for review on the merits "'if the issues raised are primarily legal, do not require further factual development, and the challenged action is final.'"  *State v. Cates*, 183 Wn.2d 531, 534, 354 P.3d 832 (2015) (internal quotation marks omitted) (quoting *State v. Sanchez Valencia,* 169 Wn.2d 782, 786, 239 P.3d 1059 (2010)).  Further, "we must consider the hardship to the [defendant] if we refused to review their challenge on direct appeal."  *Sanchez Valencia*, 169 Wn.2d at 789.

In *Cates,* our Supreme Court considered whether a facial challenge to a nearly identical community custody condition was ripe for review:

> "You must consent to [DOC] home visits to monitor your compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which you live or have exclusive/joint control/access, to also include computers which you have access to."

183 Wn.2d at 533.  The court noted that "the community custody condition is a final action and Cates' challenge raises primarily legal issues."  *Id.* at 534.

- 22 -

However, the court rejected Cates' argument that no further factual development was necessary. *Id.* at 535. In doing so, the court explained that the condition did not allow any and all searches; rather, it limited the State's authority to conduct searches to those with the purpose of "'monitor[ing] Cates' compliance with supervision.'" *Id.* at 535. Because any potential constitutional violation depended on how the State attempted to enforce the condition and search Cates' residence after he was released from confinement, the court determined that further factual development was necessary. *Id.*

Additionally, the court decided that the risk of hardship to Cates was insufficient to justify review prior to such factual development. *Id.* This was so, the court explained, because "[c]ompliance here does not require Cates to do, or refrain from doing, anything upon his release until the State requests and conducts a home visit." *Id.* at 536. Thus, the court held Cates' preenforcement challenge was not ripe and declined to review the merits. *Id.*

Holmes does not reference *Cates* in his opening brief. Rather, he relies on an unpublished opinion from Division Two of this court that "distinguished" *Cates* and reached the merits of a constitutional challenge to the same community custody condition, *State v. Franck*, No. 51994-1-II (Wash. Ct. App. Feb. 4, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2051994-1-II%20Unpublished%20Opinion.pdf.[9] *Franck* misconstrues the reasoning of *Cates* in one paragraph, contrasts the holding of *Cates* with *Sanchez Valencia* and *State v. Bahl*, 164 Wn.2d 739, 193 P.3d 678 (2008), and concludes that "the issue is ripe

---

[9] Cited pursuant to GR 14.1 only as it is the primary authority provided by Holmes in support of this challenge.

for review." *Franck*, slip op. at 19-20. *Franck* is not controlling, or persuasive on the issue of ripeness.

While the community custody condition at issue here is final, as it was imposed on the judgment and sentence, and the claim presented is primarily legal, as it is a constitutional challenge, we follow *Cates* and conclude that the issue is not ripe for review. Because the condition, like the one in *Cates*, is limited to "visits to monitor compliance and supervision" and compliance does not require Holmes "to do, or refrain from doing, anything upon his release until the State requests and conducts a home visit," the risk of hardship here does not justify review prior to the factual development that is as necessary here as it was in *Cates*.

Affirmed in part, reversed in part, and remanded.

WE CONCUR:

Díaz, J.

- 24 -